Irving v. USA                              CV-81-501-M    08/29/96 P
                   UNITED STATES DISTRICT COURT FOR THE
                          DISTRICT OF NEW HAMPSHIRE


Gail Merchant Irving,
        Plaintiff,

        v.                                          Civil No. 81-501-M

United States of America,
        Defendant.


                           MEMORANDUM DECISION


        Plaintiff, Gail Merchant Irving, sues defendant, the United

States, under the Federal Tort Claims Act ("FTCA"), 28 U.S.C.

§§ 1346(b), 2671-2680, seeking damages for serious injuries she

suffered in a workplace accident.  On October 10, 1979, Irving's

hair became caught in the unguarded rotating drive shaft of a

die-out machine located near her work station at Somersworth Shoe

Company.  Regulations promulgated by the Occupational Safety and

Health Administration ("OSHA") required that the rotating shaft

be guarded.  Before the accident, in 1975 and again in 1978, OSHA

compliance officers inspected the Somersworth Shoe facility for

the purpose of ensuring compliance with OSHA safety standards,

but in neither inspection was the unguarded drive shaft

identified or cited as violating OSHA standards.  Irving claims

in her sole cause of action that the OSHA compliance officers

breached their duty under New Hampshire's common law "Good Samaritan" doctrine to conduct the pre-accident inspections in a non-negligent manner. She also alleges that their failure to identify and cite the unguarded drive shaft as a violation of OSHA standards caused or contributed to cause her injuries. Irving's claim against the United States was tried to the court.

## PROCEDURAL HISTORY[1]

Because the procedural history of this case is unusual, a brief survey of <u>Irving v. United States</u> is necessary to put the issues in proper context.

As mentioned, Gail Irving was severely injured in a workplace accident on October 10, 1979. Seeking to hold the United States liable for her injuries, she filed a timely administrative claim for damages with the appropriate federal agency, the United States Department of Labor. <u>See</u> 28 U.S.C. § 2675(a). Her claim was denied and, on October 7, 1981, she filed suit in this court. <u>See</u> <u>id.</u>

A bench trial on the merits began on February 11, and concluded on February 14, 1985. Following trial, the court took

---

[1] The procedural history recitation is taken, in substantial part, from the First Circuit's most recent opinion in this case, <u>Irving v. United States</u>, 49 F.3d 830 (1st Cir. 1995).

2

the matter under advisement and, on January 27, 1988, dismissed Irving's suit without reaching the merits. The court determined that the discretionary function exception to the FTCA applied to OSHA inspections and, because the United States retained its sovereign immunity from suit involving such matters, the court was without subject matter jurisdiction over Irving's sole cause of action. Irving v. United States, No. C81-501-D, slip op. (D.N.H. Jan. 27, 1988) (Devine, C.J.). Irving appealed.

Shortly after the district court's dismissal order, but before the appeal was resolved, the United States Supreme Court decided Berkovitz v. United States, 486 U.S. 531 (1988). The Berkovitz decision clarified the law concerning the FTCA's discretionary function exception as it pertains to governmental regulatory activities. Accordingly, the First Circuit vacated the district court's dismissal of Irving's complaint and remanded the case for further consideration in light of the new standards established in Berkovitz. Irving v. United States, 867 F.2d 606 (1st Cir. 1988) (unpublished order).

Responding to the First Circuit's mandate, the district court analyzed Irving's claim in light of a then-recent post-Berkovitz OSHA case in which the Court of Appeals for the Fifth Circuit found the discretionary function exception applicable.

3

Irving v. United States, No. C81-501-D, slip op. at 3 (D.N.H. Feb. 14, 1989) (Devine, C.J.) (citing Galvin v. OSHA, 860 F.2d 181 (5th Cir. 1988)).  The trial court again dismissed Irving's suit, holding that it remained barred by the discretionary function exception.  Id. at 4-5.

Irving again appealed, and the First Circuit again remanded the case, insisting on a case-specific application of Berkovitz. Irving v. United States, 909 F.2d 598, 605 (1st Cir. 1990) ("Irving I").[2]  The Court of Appeals directed the district court to make explicit factual findings as to whether "the thoroughness of [OSHA] inspections was . . . left up to the individual compliance officers" and whether those compliance officers had "policy-level discretion to fail to note and tell the employer about the violation which allegedly was the cause of Ms. Irving's injuries."  Id.  (emphasis added).

Four years later, the district court issued a memorandum opinion, Irving v. United States, No. C81-501-SD, slip op. (D.N.H. June 6, 1994) (Devine, S.J.).  Instead of resolving the discretionary function issue, however, the trial court decided

_____

[2] Although Irving v. United States, 909 F.2d 598 (1st Cir. 1990) was, in fact, the First Circuit's second opinion in this case, it has, as the first published opinion, been assigned the label "Irving I."

4

the case on its merits, finding that during the 1975 and 1978 OSHA inspections the die-out machine that caused Irving's injury was positioned "some two feet closer to the wall to its rear." Id. at 4. Therefore, the court determined that the drive shaft actually did comply with OSHA regulations during the earlier inspections because it had been "guarded by location" — "it was then in such location that employees working near it would not be exposed to injury." Id. at 3. And, because the drive shaft for the die-out machine was actually guarded by location during the 1975 and 1978 inspections, the court reasoned, OSHA compliance officers were not negligent in failing to identify or cite it as a violation of OSHA safety standards. Accordingly, judgment was again entered for the government, although this time on the merits.

Irving appealed for a third time, arguing, inter alia, that the district court's guarded-by-location finding was clearly erroneous and unsupported by the evidence. The government countered that the record supported the guarded by location finding and again argued that the discretionary function exception to the FTCA barred Irving's suit in any event. Once again, the Court of Appeals found for Irving. Irving v. United States, 49 F.3d 830 (1st Cir. 1995) ("Irving II").

5

Addressing the government's renewed discretionary function argument first, the court of appeals reiterated its holding in Irving I:

> [T]he applicability of the discretionary function exception [cannot] be decided without findings as to whether OSHA policy left the thoroughness of inspections a matter of choice for individual inspectors, and whether the inspectors had policy-level discretion to fail to note and tell the employer about the violation which allegedly caused plaintiff's injuries.

Irving II, 49 F.3d at 834 (citing Irving I, 909 F.2d at 605) (emphasis added). The Court of Appeals set aside the district court's finding that the rotating shaft of the die-out machine was guarded by location during the 1975 and 1978 inspections, id. at 836, vacated the judgment of the district court, and granted Irving's request for a trial de novo before a different district court judge, committing to the discretion of the new trial judge whether to proceed solely on the record of the 1985 trial. Id. at 837.

Consistent with the First Circuit's mandate, and with the express approval of the parties, this court proceeded on the trial record, supplemented by counsels' oral argument on November 21, 1995. The court earlier denied the government's motion to dismiss, rejecting an argument that the misrepresentation

6

exception to the FTCA deprived the court of subject matter jurisdiction over Irving's cause of action. <u>Irving v. United States</u>, No. C81-501-M (D.N.H. March 13, 1996) (McAuliffe, J.). In addition, the court denied Irving's motion to increase her <u>ad damnum</u> to an amount in excess of the $1,000,000 she sought in her initial administrative claim in 1980. <u>Irving v. United States</u>, No. C81-501-M (D.N.H. March 13, 1996) (McAuliffe, J.). With all motions now disposed of, the court decides the case on the merits in light of all the evidence introduced at trial[3] and the arguments advanced by the parties, both orally and in their written submissions.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

As the procedural history of this case indicates, the parties' legal sparring over the last fifteen years has focused on two issues. First, the parties dispute whether the discretionary function exception to the FTCA preserves the government's sovereign immunity and deprives this court of subject matter jurisdiction over Irving's cause of action.

---

[3] That evidence, of course, takes the form of trial exhibits and a complete transcript of the trial testimony. Throughout this order, full trial exhibits are referred to as "Ex. ____" and trial testimony is identified by witness, date, and transcript page.

Second, the parties dispute whether the machine on which Irving was injured was, in fact, guarded by location during the 1975 and 1978 OSHA inspections. Each issue is, by itself, potentially dispositive of Irving's suit.

Because the discretionary function question implicates the court's subject matter jurisdiction, it would normally be addressed first. However, as Irving I and Irving II make clear, an acceptable answer to the discretionary function question depends on several, quite specific, findings of fact. Therefore, the court will first explain its factual findings related to Irving's accident and the OSHA inspections, including the location of the die-out machine during the 1975 and 1978 inspections. Then, based on the facts found, the court will explain why the discretionary function exception does not apply here, and, finally, the court will resolve the case on its merits.

## I.    FACTUAL BACKGROUND

In October of 1979, Gail Merchant Irving was working at the Somersworth Shoe Company plant in Somersworth, New Hampshire. Although Irving had worked in different shoe factories, including Somersworth Shoe, on and off for about four years (Irving,

8

2/11/85, p. 4), at the time of the accident she had been steadily employed at Somersworth Shoe only since mid-September, 1979. (Irving, 2/11/85, p. 6.)

### A.    Physical Layout of the Accident Scene in October, 1979

On October 10, 1979, Irving was at work in the stock fitting room of Somersworth Shoe operating a "marker" machine used to stamp the inner soles of shoes.  The marker was a manually operated machine attached to a workbench; it did not have an electric power source. (Irving, 2/11/85, p. 8, 67; Rothwell, 2/12/85, p. 5.)  Attached to the east end of the same workbench was a die-out machine.[4]  (Ex. 6, Floor Plan; Rothwell, 2/12/85, p. 4-5; Perron, 2/11/85, p. 111.)

Unlike the marker, the die-out machine was powered by a four- or five-horsepower electric motor.  (Irving, 2/11/85, p. 67; Rothwell, 2/12/85, p. 5-6; Paul, 2/14/85, p. 36.)  The motor was bolted to the concrete floor, directly beneath the west end of the workbench.  It was connected to the die-out machine by means of a drive shaft which ran underneath the workbench.  (Ex. 1, Photo of Bench Assembly; Ex. 14B, Photos 1-5.)  The drive

---

[4] Together, the marker machine, die-out machine, and workbench were known as the "bench assembly."  (See, e.g., O'Connell, 2/13/85, p. 18.)

9

shaft ran horizontally (west to east), approximately 14 inches above the floor and was located approximately 16 inches inside (south of) the rear (north) edge of the workbench.[5] When the motor was running, the horizontal drive shaft rotated at high speed. (O'Connell, 2/12/85, p. 35.)

The eastern-most edge of the workbench abutted the east wall of the stock fitting room, (Rothwell, 2/12/85, p. 13; O'Connell, 2/13/85, p. 18; 2/14/85, p. 45), while the western-most edge of the workbench was on a main aisle. (Ex. 6, Floor Plan; Ex. 14B, Photo 2; Rothwell, 2/12/85, p. 4-5.) Approximately 2½ to 3 feet behind (north of) the workbench was a die rack. The die rack was approximately the same length as the workbench and also extended

---

[5] Shortly after Irving's accident, and before any material alterations were made to the bench assembly, three different people measured the location of the drive shaft. The measurements taken by Paul O'Connell, an OSHA safety engineer, indicate that the drive shaft was 12 inches above the floor and 16 inches in from the rear edge of the workbench. (O'Connell, 2/12/85, p. 166.) The measurements taken by Igor Paul, plaintiff's industrial engineering expert, indicate that the shaft was 14 inches above the floor and 16½ inches in from the rear edge of the workbench. (Paul, 2/14/85, p. 13.) Ronald W. Perron, a captain with the Somersworth Police Department, measured the drive shaft to be 14" above the floor, and, although he did not measure the space between the edge of the workbench and the shaft, he estimated the distance to be about 2½ feet. (Perron, 2/11/85, p. 108, 113.) The evidence, then, most strongly supports the finding that the shaft was located approximately 14 inches above the floor and approximately 16 inches south of the plane created by the rear (north) edge of the workbench.

10

from the east wall of the stock fitting room to the aisle. (Ex. 6, Floor Plan; Ex. 14B, Photos 2, 14, 17; O'Connell, 2/13/85, p. 34.) Stored in the die rack were patterns, dies, and ink ribbons for use on the marker and die-out machines. (Irving, 2/11/85, p. 12; O'Connell, 2/13/85, p. 42.)

From time to time, Somersworth Shoe employees working on the marker were required to change the ribbon and/or the pattern on the machine. (Irving, 2/11/85, p. 8.) In order to retrieve patterns and ribbons from the die rack, it was necessary for the marker operator to enter the 2½ to 3 foot-wide aisle between the rear edge of the workbench and the die rack. (Ex. 6, Floor Plan; Ex. 14B, Photos 16, 17; O'Connell, 2/13/85, p. 42.) Employees also used this aisle to reach the power switch for the motor that ran the die-out machine. Because the switch was mounted on the east wall of the stock fitting room between the bench assembly and the die rack, the aisle between the workbench and the die rack provided the only access to the power switch. (Ex. 14B, Photos 13, 14; O'Connell, 2/13/85, p. 19.)

## B.   The Accident

On the afternoon of October 10, 1979, Irving needed to change the pattern and the ink ribbon on the marker machine. She

11

picked up a pair of latex gloves that marker operators used to avoid getting ink on their hands when changing the ribbon and walked around the back of the bench assembly to retrieve a new pattern and ribbon from the die rack. While standing in the aisle between the workbench and the die rack, Irving inadvertently dropped one of her gloves. (Irving, 2/11/85, p. 12.)

When Irving bent over and reached down to retrieve the glove from the floor, her hair was drawn toward the drive shaft underneath the bench by the vacuum the shaft created as it rotated at high speed.[6] Irving's hair became entangled in the shaft, and the force of the shaft's rotation wrenched her entire body down toward the floor and pulled her head into contact with the shaft, tearing her scalp from her skull and rendering her unconscious. (Gosselin, 2/11/85, p. 91; Wayne Irving, 2/11/85, p. 99-100; Rothwell, 2/12/85, p. 7-8.) As Irving's body lay over the drive shaft, with her hair still caught, the motor that

---

[6] Professor Igor Paul, plaintiff's industrial engineering expert, testified to the vacuum effect created by any smooth, rapidly rotating shaft. (Paul, 2/14/85, p. 18.) Additional evidence that the rotating drive shaft for the die-out machine did, in fact, create the expected vacuum can be found in Exhibit 14B, photographs 20 through 24, which clearly show the many threads and fibers that had been drawn toward and wrapped around the shaft over the years.

12

powered the die-out machine continued to run.  (Rothwell, 2/12/85, p. 7; Gosselin, 2/11/85, p. 90.)

Two of Gail Irving's co-workers, Joan Gosselin and Wayne Irving, extricated her from the drive shaft by turning off the motor and cutting her hair free.  (Gosselin, 2/11/85, p. 85; Wayne Irving, 2/11/85, p. 99.)  An ambulance crew arrived a short time later and took Irving to Wentworth-Douglass Hospital.  She was later transferred to Maine Medical Center, where she was treated for severe neurological damage.  (Wayne Irving, 2/11/85, p. 101-103; Ex. 23, Videotaped Testimony of Dr. McCann.)

## C.    Post-Accident OSHA Inspection

On October 16, 1979, OSHA conducted a post-accident inspection of Somersworth Shoe, before any material changes were made to the bench assembly.  (Amirault, 2/12/85, p. 26.)  During the post-accident inspection, senior safety engineer Paul O'Connell examined the marker/die-out bench assembly on which Irving was injured, taking measurements and photographs. (O'Connell, 2/12/85, p. 157; Ex. 14B, Photographs of Bench Assembly.)  O'Connell found the bench assembly to be in violation of three separate but related OSHA safety standards.  (Ex. 10, Citation and Notification of Penalty at 1.)  First, the bench

13

assembly was in violation of an OSHA regulation that states, "Shafting under bench machines shall be enclosed by a stationary casing, or by a trough at sides and top or sides and bottom, as location requires." 29 C.F.R. § 1910.219(c)(2)(ii) (1995).[7] O'Connell found that the horizontal drive shaft that delivered power to the die-out machine was not guarded in any fashion. He then classified the violation as "serious," meaning that there was a "substantial probability that death or serious physical harm could result from [the] condition." 29 U.S.C. § 666(k); (O'Connell, 2/12/85, p. 159.) Indeed, the violation was so severe, and the unguarded shaft so dangerous, that O'Connell gave the violation a "severity value" of eight, the highest severity value used by OSHA at that time. (O'Connell, 2/12/85, p. 189; Ex. 10, OSHA Worksheet at 2.)

In addition to the unguarded horizontal shaft, O'Connell found two other violations of OSHA standards. Specifically, the pulley and drive belt on the electric motor that supplied power to the shaft were also unguarded in violation of 29 C.F.R. §§ 1910.219(d)(1) and 1910.219(e)(3)(i). These violations, too,

_____

[7] The court has referred to the most recent version of the Code of Federal Regulations. However, the applicable regulations have not been materially altered since 1973, long before the earliest date relevant to this case.

were deemed "serious" in nature.  (Ex. 10, Citation and Notification of Penalty at 1.)  On October 23, 1979, OSHA fined Somersworth Shoe a total of $1800 for the three violations and ordered the company to abate the violations by November 10, 1979. The fine was later reduced to $1440.  (Ex. 10, Penalty Modification at 1.)

### D.    Pre-Accident OSHA Inspections

OSHA compliance officers had also inspected the Somersworth Shoe facility on at least two occasions prior to Irving's accident.  Compliance officer William Chase III inspected the plant on June 26, 1975 (the "1975 inspection"), and compliance officer John Ritchie inspected the plant on April 6, 1978 (the "1978 inspection").  In order to fully understand the significance of the 1975 and 1978 inspections, it is important, first, to review the regulatory framework within which they were conducted.

### 1.    OSHA Regulatory Framework

In passing the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678 (the "Act"), Congress sought to improve workplace safety by authorizing the Secretary of Labor to develop

and promulgate mandatory occupational safety and health standards. 29 U.S.C. §§ 651(b)(3) & (b)(9). Employers and employees are of course duty bound to comply with all safety and health standards promulgated under the Act. 29 U.S.C. § 654. Nonetheless, in order to enforce compliance with those standards, the Secretary of Labor is authorized to "enter without delay and at reasonable times any . . . workplace or environment where work is performed by an employee of an employer" and to "inspect and investigate during regular working hours and at other reasonable times . . . any such place of employment and all pertinent conditions . . . therein." 29 U.S.C. § 657(a)(1) & (a)(2).

Regulations promulgated pursuant to 29 U.S.C. § 655 give OSHA Area Directors and compliance officers the authority to decide when and where workplace inspections will take place. 29 C.F.R. § 1903.7(a); Irving I, 909 F.2d at 603. In addition, OSHA regulations grant individual compliance officers significant control over the manner in which particular inspections are performed. Irving I, 909 F.2d at 603 ("[F]ormal regulations . . . give the individual compliance officers discretion to decide how to conduct the inspections."); see also 29 C.F.R. 1903.7(b) & (d) (compliance officers may employ any "reasonable investigative techniques" as long as they do not amount to

16

"unreasonable disruption of the operations of the employer's establishment").

OSHA routinely conducts inspections in response to workplace accidents, employee complaints, and as part of its "programmed" enforcement efforts. (Amirault, 2/12/85, p. 26-27.) After inspecting a workplace, the compliance officer is required to informally advise the employer of any apparent safety violations disclosed by the inspection. Irving I, 909 F.2d at 604; 29 C.F.R. § 1903.7(e). The compliance officer then prepares an inspection report describing all of the violations he or she observed. See 29 C.F.R. § 1903.14(a); (Amirault, 2/12/85, p. 57.) The compliance officer's superior, the Area Director, then reviews the inspection report. "If, on the basis of the report the Area Director believes that the employer has violated a [health or safety standard] . . . , he shall issue to the employer either a citation or a notice of de minimis violations . . . ." 29 C.F.R. § 1903.14(a).

There are three levels of OSHA violations, categorized according to the level of risk they pose to employees. At one end of the spectrum are "de minimis" violations — violations of OSHA standards that have "no direct or immediate relationship to safety or health;" a de minimis violation cannot be the basis of

17

a citation or monetary penalty.  29 U.S.C. § 658(a); 29 C.F.R. § 1903.14(a).  At the other end of the spectrum are "serious" violations, which exist "if there is a substantial probability that death or serious physical harm could result from" the violative condition.  29 U.S.C. § 666(k).  Any violations deemed neither de minimis nor serious in nature fall in the middle, and are designated as "non-serious" violations.  29 U.S.C. § 666(c); Hackney, Inc. v. McLaughlin, 895 F.2d 1298, 1299 n.1 (10th Cir. 1990).  The OSHA Area Director "shall" issue a citation for a serious or non-serious violation, "shall" assess a civil penalty of up to $1,000 for each serious violation, and "may" assess a civil penalty of up to $1000 for each non-serious violation.  29 C.F.R. § 1903.14(a); 29 U.S.C. §§ 658, 666(b) & (c).  In addition to subjecting the employer to citation and possible monetary penalty, conditions that constitute serious or non-serious violations of OSHA safety standards must be abated by the employer within the time period fixed by the Area Director.  29 C.F.R. § 1903.14(b).

    **2.    OSHA Policy Governing the 1975 & 1978 Inspections**

While the Act and OSHA regulations generally leave many decisions regarding inspections in the hands of Area Directors

18

and compliance officers, the scope of the Somersworth Shoe inspections William Chase and John Ritchie performed in 1975 and 1978 was dictated by less formal, but no less binding, OSHA policy. Francis Richard Amirault, the Area Director for whom both Chase and Ritchie worked, testified extensively and with obvious candor as to what was required of the two compliance officers during their inspections of Somersworth Shoe. In addition, Chase and Ritchie testified about their own understandings of their inspection duties.

Chase and Ritchie were both instructed to perform "wall-to-wall" inspections of the Somersworth Shoe facility. (Amirault, 2/12/85, p. 27; Chase, 2/12/85, p. 102; Ritchie, 2/12/85, p. 147.) In conducting wall-to-wall inspections of the plant, both compliance officers were "charged to look at the entire plant," (Amirault, 2/12/85, p. 51), and "required" to perform a "complete inspection of the facility." (Chase, 2/12/85, p. 133; see also Amirault, 2/12/85, p. 28; Ritchie, 2/12/85, p. 147.) As the First Circuit noted, the compliance officers "could not choose simply to spot check certain areas." Irving I, 909 F.2d at 604.

Indeed, OSHA policy dictated the thoroughness required of the 1975 and 1978 inspections to an even greater degree. Chase

19

and Ritchie had to do more than merely walk through each room of the Somersworth Shoe plant. Rather, OSHA policy required them to "observe any place where an employee work[ed]." (Amirault, 2/12/85, p. 30, 55.) Toward that end, compliance officers had to "look at every operation" in the facility. (Amirault, 2/12/85, p. 30.) Thus, they had no choice but to inspect every operational machine and work station in the plant.[8]

As noted earlier, OSHA regulations required the Area Director to review the compliance officers' inspection reports for the purpose of categorizing violations and issuing notices and citations. In order to make the Area Director's review meaningful, OSHA policy required Chase and Ritchie to document or record all of the violations they observed as they conducted their inspections, whether those violations appeared to them to

_____

[8] At oral argument, the government conceded that OSHA policy required Chase and Ritchie to inspect every "operation" in the Somersworth Shoe facility. (See Transcript of 11/21/95 Oral Argument ("Tr.") at 107-109.) The government argues, however, that a duty to inspect every "operation" is somehow different from a duty to inspect every "machine." (Tr. at 108.) But the evidence makes clear, and the government does agree, that the term "operation" as used by Area Director Amirault included every machine that was operational or, phrased differently, every machine or workstation at which an employee normally worked, regardless of whether an employee was actually operating the machine during the inspection itself. (Tr. at 108-09; Amirault, 2/12/85, p. 30, 55 (agreeing that inspection should take place "machine by machine by machine."); Chase, 2/12/85, p. 129-131.)

20

be de minimis, serious, or non-serious in nature.  (Amirault, 2/12/85, p. 55, 57.)  As Area Director Amirault stated, Chase and Ritchie were required to "document any hazardous conditions that they would see."  (Amirault, 2/12/85, p. 28; see also 2/12/85, p. 25, 57-58.)

OSHA policy did not, however, require Chase and Ritchie to record nominal violations of applicable regulations if there was no potential employee exposure to the violative condition.  In order to constitute even a de minimis violation of OSHA safety standards, a workplace condition must both: (1) fail to satisfy the terms of an applicable safety regulation promulgated by the Secretary of Labor; and (2) be located in a position such that employees could potentially be exposed to it.  (Amirault, 2/12/85, p. 58, 94-95.)  Because potential exposure is a necessary component of a violation, the OSHA compliance officers were not required to report a condition that nominally violated OSHA regulations but posed no risk of exposure to employees.

OSHA policy, then, required Chase and Ritchie to perform wall-to-wall inspections of the Somersworth Shoe plant, which included a requirement that they inspect every operational machine in the facility.  In addition, the compliance officers were required to document every violation they observed, whether

21

it appeared to be a de minimis, serious, or non-serious violation of OSHA safety standards.[9]

### 3. 1975 Inspection

On June 26, 1975, OSHA compliance officer William Chase III inspected the Somersworth Shoe facility. Because Chase was not familiar with the layout of the plant, he relied on a Somersworth Shoe representative to show him every room in which employees worked. (Chase, 2/12/85, p. 124.) Chase was taken into every room in the plant, including the stock fitting room. (Chase 2/12/85, p. 124, 127; Ex. 8, OSHA Compliance Worksheet at 4, item 8.)

During the course of his inspection, Chase noticed and documented a total of 39 violations of 9 separate OSHA standards, including 14 power transmission mechanisms left unguarded in contravention of 29 C.F.R. § 1910.219. (Chase, 2/12/85, p. 126, 140; Ex. 8, OSHA Proposed Penalty Worksheet at col. 2.) Three of the unguarded power transmission mechanisms were horizontal drive shafts located in the cutting department. (Ex. 8, OSHA

_____

[9] The answer to the Court of Appeals's explicit question — "Did OSHA policy leave the thoroughness of the inspections a matter of choice for individual inspectors?" — is, therefore, "No." See Irving II, 49 F.3d at 833.

Compliance Worksheet at 3, item 6; Chase, 2/12/85, p. 126.) Chase did not, however, notice or document any violative conditions related to the bench assembly on which Irving was later injured. (Chase, 2/12/85, p. 128; Ex. 8, OSHA Compliance Worksheet.)

Immediately following his inspection, Chase held a closing conference with Samuel Freedman, then the general manager of Somersworth Shoe. The two men discussed all of the violations Chase found and agreed upon an abatement schedule. (Ex. 8, OSHA Narrative at ¶ 12.) On July 7, 1975, OSHA issued a citation to Somersworth Shoe for nine separate groups of non-serious violations. OSHA did not, however, levy a monetary penalty against Somersworth Shoe for any of the cited violations. The bench assembly on which Irving was later injured was not cited. (Ex. 8, Citation at 1-3.)

### 4.   1978 Inspection

On April 6, 1978, OSHA compliance officer John Ritchie inspected Somersworth Shoe. During the course of his inspection, Ritchie noticed and documented ten separate violations of OSHA safety standards. (Ex. 9, OSHA Worksheet at 1-10.) Three of those violations concerned unguarded drive belts. (Ex. 9, OSHA

23

Worksheet at 7-9; Ritchie, 2/12/85, p. 150.)  None of the violations Ritchie documented was located in the stock fitting room.  (Ex. 9, OSHA Worksheet at 1-10.)  Ritchie also found that Somersworth Shoe had an inadequate safety training program and no health or safety staff.  (Ex. 9, OSHA Narrative at ¶ 15; Ritchie, 2/12/85, p. 150.)

As Chase had done three years earlier, Ritchie held a closing conference with Samuel Freedman in which the two men reviewed all of the violations Ritchie found during his inspection.  On April 12, 1978, OSHA cited Somersworth Shoe for eight separate groups of violations, including three instances of unguarded drive belts.  OSHA did not fine Somersworth Shoe, but ordered all violations abated by May 8, 1978.  The bench assembly on which Irving was later injured was not cited.  (Ex. 9, Citation and Notification of Penalty at 1-2.)

## E.    Chase and Ritchie's Failure to Note Violation

It is the failure of Ritchie and Chase to identify and document the unguarded horizontal drive shaft on the bench assembly, and OSHA's failure to cite it, that form the basis of Irving's cause of action.  As noted earlier, the decision to cite an employer for a violation of OSHA safety standards is,

24

according to applicable regulations, made by an OSHA Area Director after his or her review of a compliance officer's inspection report. See 29 C.F.R. § 1910.14(a).[10] The inspection reports of Ritchie and Chase did not in any way reference the drive shaft in question. (See Ex. 8, OSHA Compliance Worksheet, Narrative, Proposed Penalty Worksheet; Ex. 9, OSHA Worksheet, Narrative.) Therefore, the court must determine the reason or reasons why neither compliance officer identified or recorded the drive shaft as being in violation of OSHA safety standards.

Both parties agree that the drive shaft was not guarded by a stationary casing or trough as required by 29 C.F.R. § 1910.219(c)(2)(ii) during the 1975 and 1978 inspections. In fact, the evidence overwhelmingly supports the conclusion that the shaft was not guarded by a casing or trough at any time prior to Irving's accident. (Rothwell, 2/12/85, p. 14-15; Couture, 2/12/85, Supp. at 8-9; Brooks, 2/12/85, Supp. at 13-15.) While

_____

[10] Under 29 C.F.R. § 1903.21(e), the Area Director may delegate to a compliance officer his or her responsibility to review inspection reports and issue citations. There is no evidence that Area Director Amirault so delegated his responsibilities in this case. Although compliance officer O'Connell signed the 1978 citation "for F.R. Amirault," the Area Director reviewed the 1975 and 1978 inspection reports for the purpose of categorizing violations and issuing appropriate citations. (See Ex. 8, OSHA Inspection Report at 1, § 36; Ex. 8, Citation at 2, 3, ¶ 14; Ex. 9, OSHA Inspection Report at 1, ¶ 38.)

25

the parties agree that the shaft had no guard, the government and Irving concur on few other facts related to the 1975 and 1978 inspections.

## 1. Guarded by Location

In order to hold OSHA liable for her injuries, Irving must first prove that the drive shaft was in violation of OSHA safety standards during one or both of the pre-accident inspections. Although the government concedes that the horizontal drive shaft was not guarded by a casing or trough, it has argued vigorously from the outset of this case that the shaft was "guarded by location" during both the 1975 and 1978 inspections.

As discussed earlier, potential employee exposure is a necessary component of a documentable violation of OSHA safety standards. The government argues that during the 1975 and 1978 inspections there existed no potential exposure to the unguarded horizontal drive shaft because it was guarded by location. That is, the government contends that in 1975 and 1978 the bench assembly was located approximately two feet to the rear (north) of the position it occupied when the accident occurred. With the bench in that position, the argument continues, access to the rear of the assembly would have been blocked by the die rack.

26

Without access to the back of the bench, employees would not have been exposed to the serious danger otherwise posed by the unguarded rotating drive shaft. Therefore, the government concludes, in 1975 and 1978 there was no violative condition for Chase and Ritchie to notice and document.

Irving counters that the evidence shows that in 1975 and 1978 the bench assembly was in substantially the same location and condition it was in at the time of her accident.[11]

In support of its argument that the bench assembly was moved, the government relies heavily on the testimony of compliance officer Chase. Although Chase apparently had no

_____

[11] In support of her position, Irving contends that under New Hampshire law "where the location of an object is at issue, evidence of the prior or subsequent location of that same object is considered strongly suggestive of its position at the time of the occurrence in question." (Plaintiff's Request for Findings of Fact and Conclusions of Law at 12, ¶ 50.) By this, Irving seems to suggest that evidence of the bench assembly's 1979 location is entitled to some special weight. Under New Hampshire law, evidence of the location of an object is admissible for the purpose of showing that the object occupied the same position at a prior point in time. State v. Harris, 101 N.H. 95, 96, 133 A.2d 483, 484 (1957), Dube v. Bickford, 92 N.H. 362, 31 A.2d 64 (1943). However, the evidence of subsequent location does not create a legal presumption to that effect, or carry more legal weight than any other evidence equally probative of prior location. Harris, 101 N.H. at 96, 133 A.2d at 484. The court will, therefore, consider the location of the bench assembly in 1979 as evidence of the location it occupied in 1975 and 1978 but will only credit it commensurate with its probative value in light of all of the evidence introduced at trial.

27

independent recollection of the bench assembly (Chase, 2/12/85, p. 118), he testified that the machine must have been guarded by location during the 1975 inspection. Chase's opinion was based largely on his belief that he simply would not have failed to notice a violation as flagrant as the unguarded shaft on which Irving was injured, had it existed during his inspection. (Chase, 2/12/85, p. 110, 119.) He stated:

> I wouldn't miss something like that on inspection, not when I already found the unguarded shafts on another piece of equipment. There's no way I missed it. Something has had to change relative to that piece of equipment [between my inspection and Irving's accident].

(Chase, 2/12/85, p. 119.) In fact, Chase felt that the unguarded rotating shaft on which Irving was injured was such a flagrant violation of OSHA safety standards that, assuming he inspected every operation in the Somersworth Shoe plant, he would not have failed to note the violation even in a "careless moment" or on his "wors[t] day." (Chase, 2/12/85, p. 134.)

In essence, then, Chase testified that because he did not notice or document that the drive shaft was in violation of OSHA safety standards the machine must have been guarded by location; and the machine must have been guarded by location because he did not notice or record the violation. Reciting the argument

28

highlights its circularity.  But, to point out the circular nature of the government's position is not necessarily to discredit it entirely or deem it hopelessly inconsistent with what actually happened.  The argument's circularity, however, does render it suspect to the extent it is not corroborated by extrinsic evidence.

In hopes of bolstering its theory that the machine was guarded by location during the 1975 and 1978 inspections, the government points to the testimony of two long-time Somersworth Shoe employees.  Roger Couture worked at Somersworth Shoe from 1944 until 1979.  From approximately 1974 until early 1979, he was foreman of the stock fitting room.  (Couture, 2/12/85, Supp. at 3-4.)  Couture testified on direct examination that the bench assembly "might have been moved, probably the whole thing, one or two feet, but that was it."  (Couture, 2/12/85, Supp. at 5.)  On cross examination he added, "The only thing is it was moved . . . a little back . . . about maybe a foot."  (Couture, 2/12/85, Supp. at 9.)  Similarly, Bruce Brooks, who worked in the stock fitting room from 1950 until early 1984 and regularly operated the die-out machine in question, noted that Somersworth Shoe "had moved a bench and they had moved a motor machine in that area at

one time.  Just when that was, I couldn't tell you."  (Brooks, 2/12/85, Supp. at 18.)

The government relies heavily on these inconclusive statements, but ignores a larger body of evidence that overwhelmingly supports the notion that the rotating shaft was neither guarded by location nor otherwise inaccessible at any time prior to Irving's accident.  In fact, the testimony of Couture and Brooks, viewed in its entirety, also supports the notion that the bench assembly had not been altered or moved in any material fashion in the five years before the accident. Couture stated that the machine had been in the same place and in the same condition throughout his tenure as foreman, that is, from 1974 until early 1979.  (Couture, 2/12/85, Supp. at 4-5.) He further testified that in 1979 the condition of the machine was exactly the same as it had been in 1975 and 1978.  (Couture, 2/12/85, Supp. at 8.)

The bulk of Brooks' testimony also strongly supports the proposition that the machine had been at or near its present position "years before Gail was on it."  (Brooks, 2/12/85, Supp. at 17; see also, 2/12/85, Supp. at 15-17.)  Significantly, Brooks testified that throughout his tenure at Somersworth Shoe employees had access to the unguarded rotating shaft from both

the front and rear of the bench assembly. (Brooks, 2/12/85, Supp. at 15.)

In addition to the testimony of those personally familiar with the bench assembly's condition and location during the 1975 and 1978 inspections, Irving points to physical and testimonial evidence establishing the permanence of the position the bench and motor occupied during the 1975 and 1978 inspections and through the time of the accident. The most convincing evidence came in the form of photographs taken by Paul O'Connell during his post-accident inspection. The photos were introduced at trial as plaintiff's Exhibit 14B (O'Connell, 2/12/85, p. 157), and clearly show that the workbench, the electric motor that drove the die-out machine, and the supports for the drive shaft were all securely bolted to the concrete floor of the stock fitting room. (Ex. 14B, Photos 1, 2, 4, 5, 15, 20, 21, 22, 23.) Igor Paul, plaintiff's expert witness, also examined the bench assembly after the accident and concluded that it could only be repositioned by removing all of the bolts from the concrete floor and, presumably, reinserting them into the floor at a different location. (Paul, 2/14/85, p. 14, 30.)

The photographs do not support the hypothesis that the bench had been moved between the OSHA inspections and the accident. In

31

fact, O'Connell's photos are convincing evidence that the bench assembly never occupied a position in the Somersworth Shoe plant other than the position it occupied in 1979. The concrete floor around the bench assembly contains no empty bolt holes or other blemishes that one would expect to find if the bench assembly had been unbolted, relocated, and rebolted to the floor, especially if it had been moved only a few feet. (Ex. 14B, Photos 1-5, 14-16, 20-24.) In addition, the wear marks beneath the foot pedal of the marker machine indicate that the bench assembly had, in 1979, occupied the same position for quite some time. (Ex. 14B, Photos 1, 2, 4, 5.)

Finally, the position of the bench assembly vis-a-vis the die rack and the power switch renders it highly unlikely that the drive shaft was guarded by location as a result of its proximity to the rack or to any other workplace condition. Neither party contends, and the evidence does not show, that the die rack was moved or materially altered at any time between 1975 and 1979.[12] The die rack had shelves extending down to the floor behind the

---

[12] Indeed, the die rack was considered so permanent a fixture that O'Connell treated it as if it were a partition or wall within the stock fitting room. (O'Connell, 2/13/85, p. 18.) Rothwell testified that the rack could only be repositioned through disassembly and was, in effect, immovable. (Rothwell, 2/12/85, p. 13-14.)

bench assembly, and Somersworth Shoe employees required regular access to the dies and patterns kept on those shelves. (Ex. 14B, Photos 1-3, 16, 17; Irving, 2/11/85, p. 8; O'Connell, 2/13/85, p. 42.) In addition, the aisle between the bench assembly and the die rack provided the only access to the power switch for the die-out machine. (Ex. 14B, Photos 13, 14.)[13] Because employees needed access to the dies, patterns, and power switch, and because the narrow aisle between the rack and the bench assembly provided the only access to these items, the aisle could not be eliminated without rendering both the die-out and marker machines useless.

Yet, in order for the drive shaft to have been effectively guarded by location, the aisle between the bench assembly and the die rack would have to have been eliminated entirely. At trial, O'Connell implied that if the bench assembly had been positioned one or two feet to the rear of the position it occupied in 1979

---

[13] The court recognizes, as did Paul O'Connell, that the power switch was theoretically moveable. (See O'Connell, 2/13/85, p. 37.) However, the photographs of the switch indicate that it was attached to the east wall of the stock fitting room in a secure and relatively permanent manner and reveal no signs that it was recently moved. (Ex. 14B, Photos 13, 14.) In addition, Couture and Rothwell confirmed that there had been no changes made to the set-up of the die-out machine from 1974 through 1979. (Couture, 2/12/85, p. 9; Rothwell, 2/12/85, p. 4-6.)

the shaft would have been guarded by location yet employees still would have been able to use the aisle to reach patterns, dies, and the power switch. (O'Connell, 2/13/85, p. 34-42.) The implication is not persuasive. The drive shaft could not have been effectively guarded by location if a functional aisle existed between the bench assembly and the die rack. In fact, if the width of the aisle had been reduced even further, but the aisle had not been eliminated, employees' exposure to the rotating shaft would have been more, not less dangerous, because they would have had less room to maneuver between the shaft and the rack, especially if they bent over to pick up a dropped item or to retrieve a pattern from the bottom shelf. Therefore, even if the government were correct in postulating that during the 1975 and 1978 inspections the bench assembly was located one or two feet to the rear of its 1979 position, the shaft still would not have been effectively guarded by location.

The court finds that Irving has demonstrated, by a decided preponderance of the evidence, that during the 1975 and 1978 inspections the bench assembly was in the same position it occupied at the time of her injury. It was not guarded by location. Operation of the die-out machine while the drive shaft remained unguarded was in flagrant violation of OSHA safety

standards.  The die-out machine was in operation during both inspections.[14]

## 2.    Failure to Inspect Every Machine

Despite the flagrant nature of the OSHA violation, Chase and Ritchie did not notice or document the dangerous condition during the 1975 and 1978 inspections.  The government argues, however, that those failures cannot, even if they amounted to actionable negligence under New Hampshire law, support the imposition of liability under the FTCA because OSHA inspections are discretionary functions, for which Congress has preserved the government's immunity from suit.  In order to determine whether the discretionary function exception to the FTCA's immunity waiver applies to this suit, it is first necessary to determine why the inspectors failed to notice and document the unguarded drive shaft.

-------------------------------------------------

[14] Necessary to this conclusion is a finding that the die-out machine was not taken out of operation, thereby eliminating worker exposure to the rotating shaft, for any significant period of time.  The evidence establishes that the die-out machine was in near-continuous operation during the relevant time frame. Both its position and condition remained virtually unchanged. (Rothwell, 2/12/85, p. 4-5; Couture, 2/12/85, Supp. at 8; Brooks, 2/12/85, Supp. at 17; Chase, 2/12/85, p. 131.)

35

The existence of the safety violation in 1975 and 1978 having been established, the evidence is arguably consistent with two plausible explanations for the compliance officers' oversight. First, Chase and Ritchie could have inspected the bench assembly but failed to notice the unguarded drive shaft. Second, both compliance officers could have neglected to inspect this particular bench assembly and, as a result, failed to notice the obvious unguarded drive shaft.[15] It is, of course, very difficult to determine precisely what happened during two separate inspections approximately two decades ago. But, upon careful examination of the record, the preponderance of the evidence introduced at trial supports the conclusion that both Chase and Ritchie failed to inspect the bench assembly on which Irving was subsequently injured, and the court so finds.

---

[15] The government suggests a third possibility: Both compliance officers noticed the unguarded drive shaft and, despite the obvious nature of the violation, made a judgment call that there was not sufficient potential employee exposure to justify documenting the condition as a violation of OSHA safety standards. The record does not support this suggestion and the court rejects it as a factual matter; neither compliance officer testified that he noticed the unguarded drive shaft, much less engaged in the judgment analysis the government seeks to ascribe to him. To the contrary, Chase testified that he never noticed the unguarded drive shaft and, if he had, he would have recognized it as a blatant and unmistakable violation of OSHA safety standards.

Both Chase and Ritchie were required to examine every operation in the Somersworth Shoe plant during their respective wall-to-wall inspections and did not possess the discretion to do otherwise. Chase testified that he walked down every aisle of every floor that management indicated employees worked on. (Chase, 2/12/85, p. 134.) In addition, Chase's inspection report shows that he inspected many machines in the stock fitting room and elsewhere in the plant. (Ex. 8, OSHA Compliance Worksheet at 1-4.) The bench assembly was located directly on a main aisle in the stock fitting room. (Ex. 6, Floor Plan.) Chase did not testify, however, that he inspected every operation in the facility. Ritchie did not testify at all regarding the thoroughness of his inspection in 1978, but his inspection report indicates that he, too, inspected many machines in the plant. (Ex. 9, OSHA Worksheet at 1-10.) Unfortunately, none of these facts, taken alone or together, is direct, probative evidence of whether or not the compliance officers actually inspected the particular bench assembly in question.

There is, however, considerable circumstantial evidence regarding the scope of the inspections actually performed. Every trained person who laid eyes on the bench assembly, or saw a photograph of it after the accident, recognized the unguarded

37

drive shaft as a blatant and very serious violation of OSHA safety standards.  Chase testified that if he had, in fact, inspected the bench assembly, he could not have failed to recognize that the drive shaft was a serious violation.  (Chase, 2/12/85, p. 134.)  While he acknowledged that inspectors do, on occasion, fail to notice violations, he "wouldn't miss something like that; it's too obvious, positively."  (Chase, 2/12/85, p. 113.)

Area Director Amirault concurred, stating that if a prudent inspector saw the bench assembly depicted in O'Connell's post-accident pictures, he should have noticed the unguarded drive shaft and recognized it as a violation of OSHA safety standards. (Amirault, 2/12/85, p. 66-67.)  O'Connell, too, confirmed the obvious nature of the violation, classifying it as "serious" and assigning it a severity value of eight.  (O'Connell, 2/12/85, p. 159.)

In light of that evidence, a finding that Chase and Ritchie inspected the bench assembly but failed to notice the unguarded drive shaft or recognize it as a violation of OSHA safety standards would be tantamount to a finding that both compliance officers were not merely negligent, but utterly incompetent.  As Chase stated, any compliance officer looking at the bench

38

assembly would have recognized the unguarded drive shaft as a serious violation on his or her worst day.

Of course, the record would not support a finding that Chase and Ritchie were utterly incompetent. The evidence establishes that both men were quite skilled and thorough in identifying and documenting violative conditions. Both were experienced workplace inspectors who obviously took their responsibilities seriously. (Chase, 2/12/85, p. 100-01; Ritchie, 2/12/85, 145-46.) Chase had performed approximately 180 workplace inspections prior to inspecting the Somersworth Shoe plant. (Chase, 2/12/85, p. 100-01.) During the 1975 inspection, Chase noticed and documented 39 violations of OSHA safety standards, including 14 power transmission mechanisms left unguarded in violation of 29 C.F.R. 1910.219, the same general regulation under which Irving's bench assembly was later cited. Similarly, Ritchie noticed and recorded 10 separate violations during his inspection of Somersworth Shoe, including three unguarded drive belts. The preponderance of the evidence, therefore, decidedly supports the conclusion that both Chase and Ritchie would have recognized that the bench assembly violated OSHA safety standards requiring the guarding of power transmissions if they had, in fact, inspected it.

39

Given these findings,[16] there is but one probable, realistic explanation for Chase and Ritchie's failure to notice and document the unguarded drive shaft:  Neither compliance officer actually inspected the bench assembly during his tour of the Somersworth Shoe plant.  Chase and Ritchie were not incompetent; they simply were not as comprehensive in their inspections as OSHA policy required them to be.  Rather than inspect _every_ operation in the plant, they inspected _most_ of them, in effect spot-checking (albeit thoroughly) the facility for violations of OSHA safety standards.  It is the inspectors' failure to inspect _every_ _operation_, as was required of them, that properly forms the basis of Irving's cause of action under New Hampshire's Good Samaritan doctrine and the FTCA.

## II.  DISCRETIONARY FUNCTION EXCEPTION

---

[16] The relevant findings include: (1) The drive shaft was not guarded by a casing or trough during the 1975 or 1978 inspections; (2) the drive shaft was not guarded by location or otherwise rendered inaccessible to employees or inoperative during the 1975 or 1978 inspections; (3) Chase and Ritchie did not observe the unguarded shaft and make a judgment call that it was not a violation of OSHA safety standards; and (4) had Chase and Ritchie inspected the bench assembly they would have noticed and documented the unguarded drive shaft as a serious violation of OSHA safety standards.

Irving necessarily brings her Good Samaritan action against the government under the FTCA, 28 U.S.C. §§ 1346(b), 2671-2680. The FTCA operates as a broad waiver of sovereign immunity, giving district courts jurisdiction to hear tort suits against the United States for damages caused by federal employees acting within the scope of their duties, where the United States, if a private person, would be liable under the law of the place where the tort occurred. 28 U.S.C. §§ 1346(b), 2674; see also Irving I, 909 F.2d 598, 600 (1st Cir. 1990). This broad waiver of sovereign immunity is, however, subject to several statutory exceptions, including the so-called "discretionary function exception," which exempts:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). Section 2680 "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. Varig Airlines, 467 U.S. 797, 808 (1984); see also Irving I, 909

41

F.2d at 600. "Because § 2680(a) is a limitation on the waiver of sovereign immunity, cases which fall within the discretionary function exception are dismissed for lack of subject matter jurisdiction." Irving I, 909 F.2d at 600.

"The determination of whether the discretionary function exception bars a suit against the Government is guided by several established principles." Berkovitz v. United States, 486 U.S. 531, 536 (1988). First, "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." Id. (quoting Varig Airlines, 467 U.S. at 813). The inquiry, then, focuses on the "permissible range of action available to the government employee allegedly at fault." Irving I, 909 F.2d at 600. Specifically, "[i]n examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice." Berkovitz, 486 U.S. at 536; Irving I, 909 F.2d at 600. "[T]he requirement of judgment or choice is not satisfied if a `federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because `the

42

employee has no rightful option but to adhere to the directive.'"
Irving II, 49 F.3d 830, 835 (1st Cir. 1995) (quoting United
States v. Gaubert, 499 U.S. 315, 322 (1991)) (internal quotations
omitted, emphasis supplied in Irving II).

Even if the challenged conduct is the product of an
employee's permissible exercise of judgment, suit is barred only
if that judgment "is of the kind that the discretionary function
exception was designed to shield.  The basis for the
discretionary function exception was Congress' desire to `prevent
judicial "second-guessing" of legislative and administrative
decisions grounded in social, economic, and political policy
through the medium of an action in tort.'"  Berkovitz, 486 U.S.
at 536-37 (quoting Varig Airlines, 467 U.S. at 814).  "The
exception, properly construed, therefore protects only
governmental actions and decisions based on considerations of
public policy."  Id. at 537.  "In sum, the discretionary function
exception insulates the Government from liability if the action
challenged in the case involves the permissible exercise of
policy judgment."  Id.  (emphasis added).

The first step in deciding the discretionary function
exception question presented here, then, is determining exactly
what constitutes the "challenged conduct."  See, e.g., Gaubert,

499 U.S. at 327-28; <u>Berkovitz</u>, 486 U.S. at 539-40, 543-44; <u>Varig Airlines</u>, 467 U.S. at 814-15, 819. Irving's complaint alleges that "[t]he [1975 and 1978] inspections of said Somersworth Shoe Company were performed in a negligent . . . manner in that the defendant failed to issue citations for violations of the said Occupational Safety and Health Act." (Irving's Complaint at 3, ¶ 9.) It adds that the government "breached its duty to the employees of said Somersworth Shoe Company, including the plaintiff, by negligently performing the said inspections of said shoe shop." <u>Id.</u> at 3, ¶ 10. Irving's complaint, therefore, challenges the manner in which Chase and Ritchie conducted the 1975 and 1978 inspections and is phrased broadly enough to encompass all of the discrete actions the compliance officers took, or failed to take, during those inspections.[17]

---

[17] Reading Irving's complaint to allege negligence on the part of the compliance officers in their performance of the several specific actions that constituted the 1975 and 1978 inspections is consistent with a liberal reading of the complaint and is in harmony with the Supreme Court's assessment of the complaints in both <u>Berkovitz</u> and <u>Varig</u>. In <u>Berkovitz</u> the Court read plaintiffs' broad averment of negligent licensing and release of a polio vaccine as alleging negligence at each relevant step of the multi-stage licensing and release procedures. <u>Berkovitz</u>, 486 U.S. at 539-40, 543-44. Similarly, in <u>Varig Airlines</u> the Court read plaintiff's allegation that the FAA was negligent in failing to inspect certain elements of aircraft design as "necessarily challeng[ing] two aspects of the certification procedure: the FAA's decision to implement the `spot-check' system of compliance review, and the application of

44

At trial, Irving's proof established that the inspectors were negligent, if at all, in failing to inspect the marker/die-out bench assembly.  As the court has found, the evidence would not support a finding that the actions of the compliance officers or any other Department of Labor employee were deficient, much less negligent, at any other stage of the 1975 and 1978 inspections or subsequent citation processes.  Therefore, it is Chase's and Ritchie's failure to inspect the bench assembly during the 1975 and 1978 inspections that forms the basis of Irving's cause of action and constitutes the "challenged conduct" for the purposes of applying the discretionary function exception.[18]

With the facts surrounding the 1975 and 1978 inspections found, and the challenged conduct defined, resolution of the

_____

that `spot-check' system to the particular aircraft involved." Varig Airlines, 467 U.S. at 819.

[18] Because the court has already found that the OSHA compliance officers failed to inspect every operational machine, as required by OSHA policy, this order does not delve into whether each stage of the multi-step inspection and citation process involved a discretionary or mandatory function.  Rather, it addresses in depth the only step relevant in light of the evidence presented at trial — the failure to inspect every operational machine.  As explained more fully below, whether or not the compliance officers performed other discretionary functions is irrelevant because Irving has not proven that they acted improperly or breached a duty owed Irving at any other point during the inspection and citation process.

45

discretionary function issue becomes relatively straightforward in light of <u>Berkovitz</u>:  the discretionary function exception does not deprive this court of subject matter jurisdiction over Irving's suit because OSHA policy governing the 1975 and 1978 inspections did not give inspecting compliance officers any discretion to not inspect particular operational machines within the Somersworth Shoe facility.  Rather, OSHA policy prescribed a definite and mandatory course of action for the compliance officers to follow.  They were required to inspect <u>every</u> operational machine in the plant and could not do less; anything less would amount to an unauthorized spot-check of the facility.  Having alleged and proven the existence of that mandatory duty, Irving may maintain her suit to the extent it focuses on Chase's and Ritchie's failure to comply with it.[19]

Indeed, this case is strikingly similar to <u>Berkovitz</u>, in which the plaintiff sued the government alleging that the National Institute of Health's Division of Biologic Standards ("DBS") licensed a polio vaccine without first receiving test

_____

[19] At oral argument, the government agreed that such a failure on the part of OSHA inspectors implicates a mandatory duty.  Attorney Pyles stated, "If there's a requirement to look at every machine and he does not look at every machine, then I would agree that that's a violation of a mandatory regulation." (Tr. at 111.)

data on the safety of the vaccine. Applicable statutes and regulations required, as a precondition to licensing, that the DBS receive safety test data on the vaccine from the manufacturer. Because the DBS had no discretion to issue the license without first receiving the test data, the discretionary function exception did not bar the plaintiff's suit. Berkovitz, 486 U.S. at 540-43. Here, Irving has likewise proven that OSHA compliance officers had a duty to inspect every operational machine before they compiled the inspection reports upon which citation decisions were based. She has also proven that the compliance officers did not inspect the bench assembly before preparing their inspection reports. She may, therefore, maintain her suit challenging the compliance officers' failure to inspect the bench assembly.

In contrast, this case is readily distinguished from Varig Airlines, in which the discretionary function exception did bar suit because FAA inspectors were "specifically empowered" to spot-check aircraft under construction for compliance with FAA regulations. Varig Airlines, 467 U.S. at 820. Here, "the compliance officers were required by OSHA to inspect the entire Somersworth Shoe plant; they could not choose simply to spot check certain areas." Irving I, 909 F.2d at 604.

47

Although the government concedes that the compliance officers were under a mandatory duty to inspect every operation (Tr. at 107), it points to a number of discretionary functions performed by Chase and Ritchie during the course of the 1975 and 1978 inspections in support of its argument that the discretionary function exception bars Irving's suit entirely.  It is undoubtedly true that both Chase and Ritchie did exercise policy-level discretion in performing certain of their assigned duties.  For instance, the compliance officers could and did exercise discretion, informed by public policy concerns, when they made determinations regarding whether or not particular workplace conditions presented sufficient risks of employee exposure to justify documenting them as potential violations of OSHA safety standards.  Similarly, the Area Director, when classifying violations as de minimis, non-serious, or serious, exercised policy-level discretion.

But while the government's premise is sound — Chase and Ritchie did perform discretionary functions during the 1975 and 1978 inspections — its conclusion that the discretionary function exception bars Irving's suit does not follow.  Irving's suit is barred only to the extent it alleges that OSHA employees were negligent in performing any of those discretionary functions.

48

Irving could not, for example, sue the government if OSHA had decided not to inspect the Somersworth Shoe plant at all. Varig Airlines, 467 U.S. at 819-20 ("When an agency determines the extent to which it will supervise safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind."). She also could not bring an action under the FTCA if OSHA formulated and followed a policy of spot-checking machines and, as a result, failed to find the violative condition leading to her injury. Id. at 820; Berkovitz, 486 U.S. at 546. She likewise could not sue if OSHA left it up to the assigned inspectors to determine how thorough an inspection to conduct. Nor could she sue the government if the compliance officers inspected the bench assembly but wrongly concluded that there was insufficient employee exposure to justify a citation, however gross an abuse of discretion that judgment might have been. Berkovitz, 486 U.S. at 544-45. And she could not sue if OSHA mistakenly categorized a serious violation as de minimis. Id. Each of those situations would involve, at most, an abuse of discretion, but the exercise of discretion nonetheless, and the exercise of discretion is generally immune from scrutiny under the FTCA.

But while the discretionary function exception would bar many, if not most, suits arising from negligent OSHA inspections, it does not bar Irving's suit. This is so because none of the scenarios advanced by the government actually occurred in this case. Instead, Chase and Ritchie failed to inspect the bench assembly at issue despite a mandatory duty to inspect it. Under Berkovitz, Irving may sue the government for that failure.[20]

In light of the court's finding that Chase and Ritchie failed to inspect the bench assembly despite a mandatory duty to do so, the government is limited to arguing, in effect, that the fact that the compliance officers performed several other discretionary functions shields their challenged conduct from suit, even though the challenged conduct implicates a mandatory duty. This argument ignores the clear lesson of both Varig

---

[20] This is not to imply that this is the only conceivable failure on the part of OSHA that could give rise to a cause of action under the FTCA. For instance, if Irving had proved that Chase and Ritchie inspected the bench assembly, noticed the unguarded rotating drive shaft, determined that sufficient employee exposure to the hazard existed, but failed to document the violative condition, Irving could likely maintain a suit against the government for that failure consistent with the discretionary function exception. Similarly, if Irving demonstrated that OSHA actually decided there existed a substantial probability that death or serious physical harm could result from a violative condition, yet refused to issue a citation for that condition, Irving could maintain a suit challenging that failure. Some actions become mandatory once discretion has actually been exercised.

_Airlines_ and _Berkovitz_ that the proper inquiry is whether the "_challenged conduct_ . . . is a matter of choice for the acting employee."  _Berkovitz_, 486 U.S. at 536 (emphasis added); _see also_ _Varig Airlines_, 467 U.S. at 813.  While Irving cannot maintain a suit based on the government's failure to properly perform a discretionary function, she may indeed sue for breach of mandatory duties that did, in fact, occur.[21]

Finally, to avoid a decision on the merits of Irving's suit, the government advances another version of the same argument rejected above.  The government argues that Irving has not identified any statute, regulation, or policy requiring OSHA compliance officers to "notice" or "find" every safety violation that existed within the four walls of the Somersworth Shoe plant,

---

[21] Of course, in order to succeed on the merits of her Good Samaritan claim, Irving must prove that the compliance officers' failure to inspect the bench assembly breached a duty recognized under state law and was causally related to her injury.  The causal chain may include proof that OSHA employees would more likely than not have performed certain actions that are discretionary in character (i.e. classifying the unguarded drive shaft as a violation and citing Somersworth Shoe for that violation).  The causal chain may include functions that are discretionary without barring suit over the violation of mandatory duties.  This notion is implicit in _Berkovitz_, 486 U.S. at 544-45, where the Supreme Court allowed a suit in which it was alleged that the DBS licensed a polio vaccine without receiving the required test data; DBS employees would have exercised discretion in making the licensing determination once they received the required test data.

51

and, as a result, the discretionary function exception bars any suit alleging that the injury occurred as a result of OSHA's failure to find or cite a violative condition.[22]

Once again, the government's premise is correct:  Irving has not proven the existence of a policy requiring Chase and Ritchie to find or notice every safety violation in the facility.  The Court of Appeals said in Irving I, 909 F.2d at 604-05, that there is some evidence in the record suggesting the existence of such a duty and perhaps it's a plausible suggestion.  For instance, in response to a question by plaintiff's counsel regarding the scope of the 1975 and 1978 inspections, Area Director Amirault stated, "[Y]ou would have to ask the compliance officer exactly how he proceeded, but he should be observing and documenting any violative condition . . . ."  (Amirault, 2/12/85, p. 29-30 (emphasis added).)  But, while this and similar statements by

---

[22] The court addresses this argument separately because both parties have hotly disputed its validity and the First Circuit has twice directed the district court to determine whether there existed a mandatory "duty to find," Irving I, 909 F.2d at 604, or "requir[ement] . . . to notice," Irving II, 49 F.3d at 835, all safety violations within the four walls of the Somersworth Shoe plant.  As phrased, the answer to the Court of Appeals's specific question, did "the inspectors [have] policy-level discretion to fail to note and tell the employer about the violation"? Irving II, 49. F.3d at 834, is:  The inspecting officers were not mandated or required to find or notice every violation, but were required to report all de minimus, non-serious, and serious violations that they did find.

Amirault could conceivably be interpreted as meaning that OSHA policy required Chase and Ritchie to notice every violation within the plant (a stretch this court is unwilling to make), the vast majority of the evidence presented at trial, including the bulk of Amirault's testimony, establishes that OSHA policy imposed upon the compliance officers only the more realistic duty to document all violations that they did, in fact, notice during their inspections. OSHA policy did not (and as a practical matter could not reasonably) require them to find every single violation that existed in the facility, perfection being more aspirational than achievable. Amirault repeatedly stated that the inspectors' job was to inspect every operation in the plant and "document any hazardous conditions that they would see." (Amirault, 2/12/85, p. 28 (emphasis added); see also 2/12/85, p. 25, 57, 58, 88-89.) In fact, Amirault nearly always qualified his answers in an attempt to distinguish between the duty to record recognized violations and the duty to notice all violations that existed. (See, e.g., Amirault, 2/12/85, p. 55.) Irving could not, therefore, sue the government under the FTCA for OSHA's mere failure to conduct perfect safety inspections.

For the reasons discussed above, however, the fact that Chase and Ritchie were under no mandatory duty to find every

violative condition is neither here nor there.  What is important is that they were under a mandatory duty to inspect every operational machine and failed to do so.  In fact, it was by inspecting every operational machine that OSHA expected to meet its goal of identifying and eliminating all workplace safety hazards to the extent humanly possible.  It makes sense, then, that Irving can maintain her suit for negligent failure to inspect every operational machine, even though she could not bring a cause of action based on Chase's or Ritchie's failure to carry out their inspection of each machine perfectly, had they actually looked at every machine.

Because Irving has proven the existence of a mandatory duty on the part of Chase and Ritchie, and because her suit is based on their failure to carry out that duty, the discretionary function exception to the FTCA does not deprive this court of subject matter jurisdiction over Irving's sole cause of action. With the jurisdictional question resolved, the court now proceeds to consider the merits of Irving's claim under New Hampshire's Good Samaritan doctrine.


**III. GOOD SAMARITAN DOCTRINE**

Under the FTCA, the United States is liable in tort "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The FTCA, then, does not create new causes of action, but, instead, waives sovereign immunity for certain causes of action founded on state law. In fact, "even where specific behavior of federal employees is required by federal statute, liability to the beneficiaries of that statute may not be founded on the Federal Tort Claims Act if state law recognizes no comparable private liability." Zabala Clemente v. United States, 567 F.2d 1140, 1149 (1st Cir. 1977), cert. denied, 435 U.S. 1006 (1978). "`[T]he test established by the Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred.'" Dorking Genetics v. United States, 76 F.3d 1261, 1266 (2d Cir. 1996) (quoting Rayonier, Inc. v. United States, 352 U.S. 315, 319 (1957)) (alteration in Dorking Genetics).

The court must, therefore, first look to the law of New Hampshire to determine whether the United States could be liable for Irving's injuries. Under New Hampshire law, a plaintiff

claiming negligence on the part of a defendant must show that:
(1) the defendant owed the plaintiff a duty; (2) the defendant
breached that duty; (3) the plaintiff suffered an injury; and (4)
the defendant's breach of duty was the proximate cause of
plaintiff's injury.  Ronayne v. State, 137 N.H. 281, 284, 632
A.2d 1210, 1212 (1993).

## A.  Duty

The threshold inquiry in any negligence action is whether
the defendant had a legal duty to defend the plaintiff against
injury.  Here, Irving relies on the so-called "Good Samaritan"
doctrine, as described in the Restatement (Second) of Torts
§ 324A and recognized by New Hampshire law, as the basis for the
government's duty.  See Williams v. O'Brien, 140 N.H. 595, 669
A.2d 810 (1995); Walls v. Oxford Management Co., 137 N.H. 653,
659, 633 A.2d 103, 106 (1993); Corson v. Liberty Mut. Ins. Co.,
110 N.H. 210, 212-14, 265 A.2d 315, 318-19 (1970); Kirk v. United
States, 604 F. Supp. 1474, 1482 (D.N.H. 1985).  Section 324A
provides:

> One who undertakes, gratuitously or for
> consideration, to render services to another
> which he should recognize as necessary for
> the protection of a third person or his
> things, is subject to liability to the third
> person for physical harm resulting from his

56

failure to exercise reasonable care to protect his undertaking, if
    (a) his failure to exercise reasonable care increases the risk of such harm, or
    (b) he has undertaken to perform a duty owed by the other to the third person, or
    (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

In order to establish that the United States owed her a duty of care, therefore, Irving must establish that OSHA undertook to render services to Somersworth Shoe necessary for the protection of Somersworth Shoe's employees, including Irving. Irving must also prove that: (1) OSHA's failure to exercise due care in rendering services increased the risk of harm to her; or (2) OSHA undertook a duty owed by Somersworth Shoe to her; or (3) she suffered harm because of her reliance, or the reliance of Somersworth Shoe, upon OSHA's undertaking.[23]

---

[23] Courts differ as to whether the three disjunctive prongs of the Good Samaritan doctrine are most appropriately viewed as creating defendant's duty to plaintiff or in establishing the requirements of proximate cause. See Blessing v. United States, 447 F. Supp. 1160, 1193 n.51 (E.D. Pa. 1978) (noting the disagreement and stating that Pennsylvania courts construe the three disjunctive requirements of section 324A to state the requirements of proximate cause). This difference in approach is at once understandable and immaterial to the outcome, as the definitions of both duty and proximate cause require the foreseeability that these three prongs guarantee. See Corso v. Merrill, 119 N.H. 647, 651, 406 A.2d 300, 303 (1979). Both the New Hampshire Supreme Court and the Court of Appeals for the

"[A]pplication of the `Good Samaritan' doctrine is at bottom a question of state law . . . ." Varig Airlines, 467 U.S. at 815 n.12. In this case, the task of determining whether the government owed Irving a duty enforceable under the FTCA is simplified greatly by the fact that New Hampshire has already imposed the Good Samaritan duty upon workplace inspectors in a situation that is the precise private analogue to that presented here. In Corson v. Liberty Mutual Ins. Co., 110 N.H. 210, 265 A.2d 315 (1970), the New Hampshire Supreme Court considered "whether a company which undertakes to assist accident prevention by additional inspections and advice rendered to the company primarily charged with the duty can be liable for negligent inspection to an injured employee." Id. at 212. The court answered the question in the affirmative, finding that the relationship between the inspecting and inspected companies could give rise to a duty on the part of the inspecting company to use due care in conducting the inspection. Id. Further, the court considered it "beyond debate that if a duty on the part of the [inspector] were found to have existed, that duty extended to

First Circuit have treated these three requirements as prerequisites to establishing that the defendant's duty extends to the plaintiff. See Corson, 110 N.H. at 212-14, 265 A.2d at 318-19; Walls v. Oxford, 137 N.H. at 659, 633 A.2d at 106; Zabala Clemente, 567 F.2d at 1145.

58

[the injured employee of the inspected company] who was clearly within the orbit of risk which would be created by negligent performance of the duty."[24]  <u>Id.</u> at 213.

The reasoning of <u>Corson</u> applies with equal force here, and, under the New Hampshire Supreme Court's interpretation of the Good Samaritan doctrine, the government owed Irving a duty to exercise due care in carrying out its inspection of the Somersworth Shoe plant.  First, OSHA undertook to provide precisely the same service considered in <u>Corson</u> and contemplated by section 324A of the Restatement — "to assist accident prevention by additional inspections and advice rendered to the company primarily charged with the duty" to ensure workplace

_____

[24] The Restatement and <u>Corson</u> present slightly different formulations of the Good Samaritan doctrine.  For instance, the "orbit of risk" required by the <u>Corson</u> formulation appears to serve the same function as do the three disjunctive requirements of section 324A of the Restatement — all ensure that the injured third person is a reasonably foreseeable plaintiff, an essential element of establishing the existence of a duty under New Hampshire law.  "`The risk reasonably to be perceived defines the duty to be obeyed.'" <u>Corso v. Merrill</u>, 119 N.H. 647, 651, 400 A.2d. 300, 303 (1979) (quoting <u>Palsgraf v. Long Island R.R.</u>, 162 N.E. 99, 100 (N.Y. 1928)); <u>see</u> <u>also</u> <u>White v. Schnoebelen</u>, 91 N.H. 273, 274-75, 18 A.2d 185 (1941).  In this decision, the court will attempt to address the issue of duty in a manner that references both formulations.  Of course, to the extent the <u>Corson</u> Good Samaritan doctrine differs substantively from the language of the Restatement, the New Hampshire Supreme Court's interpretation of the doctrine controls.

safety.[25]  Id. at 212.  Area Director Amirault stated that the inspections "provided a lot of assistance to employers" as they strove to meet their obligation to prevent workplace accidents.[26]

_____

[25] The obvious similarity between the inspection considered in Corson, which was performed by an insurer, and the inspections performed by OSHA, is underscored by the testimony of Bruce Brooks who stated that he, as an employee of Somersworth Shoe, never distinguished between the private inspectors and OSHA compliance officers who periodically inspected the plant. (Brooks, 2/12/85, Supp. at 15-16.)  From his point of view, both types of inspections served the single purpose of identifying and correcting unsafe working conditions.

[26] The government contends that the "punitive" nature of the inspection process requires a finding that the 1975 and 1978 inspections were not "services" within the meaning of New Hampshire's Good Samaritan doctrine.  The argument fails on several grounds.  First, it ignores the weight of the evidence. Area Director Amirault testified with apparent candor that the inspection process served both to enforce OSHA health and safety standards (an arguably punitive purpose) and to assist employers in improving workplace safety (a decidedly non-punitive end). Second, and more fundamentally, under the Good Samaritan doctrine as applied to the government via the FTCA, "[t]he reason for undertaking the inspection is not important.  While the existence of a federal statutory duty as the reason for undertaking the action will not automatically create liability, neither will such a duty preclude liability." United Scottish Ins. Co. v. United States, 614 F.2d 188, 193-94 (9th Cir. 1979), aff'd in relevant part sub nom. United States v. Varig Airlines, 467 U.S. 797 (1984).  Finally, and on a closely related note, the government's argument is tantamount to a suggestion that the government may avoid liability under the FTCA for "uniquely governmental functions" such as enforcement activities in general or regulatory enforcement in particular.  The Supreme Court rejected these contentions in Indian Towing Co. v. United States,  350 U.S. 61, 67 (1955), and Berkovitz, 486 U.S. at 538-39, respectively.

(Amirault, 2/12/85, p. 47; see also 2/12/85, p. 45-48.)

The government's duty to use due care in rendering services extends to Irving for the same reason it extended to the plaintiff in Corson: an inspector's failure to act with due care in carrying out a safety inspection can fairly be said to increase the risk of harm by "`cloak[ing] the defect, dull[ing] the call to vigilance, and so aggravat[ing] the danger.'" Corson, 110 N.H. at 214, 265 A.2d at 319 (quoting Marks v. Nambil Realty Co., 245 N.Y. 256, 259, 157 N.E. 129, 130 (1927) (Cardozo, C.J.)). Here, Somersworth Shoe employees and employees of Wood Heel, another shoe company housed in the same building, were aware of the existence, purpose, and scope of the OSHA inspections, as well as the fact that their employers were required to abate any cited violations. (Irving, 2/11/85, p. 37; Gosselin, 2/11/85, p. 87-94; Brooks, 2/12/85, Supp. at 15.) As a result, the inference that negligence on the part of OSHA in performing its inspections increased the risk of harm to Somersworth Shoe employees by dulling their vigilance regarding workplace hazards is a valid one. The compliance officers' oversight did, in fact, "negligently mak[e] matters worse." Rodrigue v. United States, 968 F.2d 1430, 1434 (1st Cir. 1992). Irving is, therefore, a foreseeable plaintiff to whom OSHA owed a

61

duty of reasonable care.  See Restatement (Second) of Torts § 324A(a).

OSHA's duty extends to Irving for a second reason not addressed in Corson, but contemplated by section 324A(c) of the Restatement:  Somersworth Shoe reasonably relied on OSHA to perform its inspections in a non-negligent manner.  See Restatement (Second) of Torts § 324A(c), cmt. e.  Roger Couture, foreman of the stock fitting room, gave unrebutted testimony that Somersworth Shoe "actually depend[ed]" on the OSHA inspections to find safety problems that the company had overlooked.[27] (Couture, 2/12/85, Supp. at 7.)  Therefore, under the Good

_____

[27] The government argues that even if Somersworth Shoe did rely on the OSHA inspections, such reliance was not reasonable because the primary duty to comply with OSHA safety standards remained at all times with Somersworth Shoe and its employees. See 29 U.S.C. § 654.  Once again, the government draws a faulty conclusion from a perfectly valid premise.  Somersworth Shoe of course retained its own duty to comply with OSHA safety standards.  And for this reason, the court finds that OSHA did not "undertake[] to perform a duty owed by [Somersworth Shoe] to [Irving]," as contemplated by section 324A(b) of the Restatement. But the fact that Somersworth Shoe retained its own duty does not mean that it could not reasonably expect OSHA compliance officers to use due care when they acted to assist it in meeting its obligations under the Act.  In Corson, the inspecting company owed the inspected company a duty to use due care despite the fact that the inspected company retained primary responsibility for preventing workplace accidents.  Corson, 110 N.H. at 212, 265 A.2d at 317-18.

Samaritan doctrine, the government owed Irving a duty to exercise due care in conducting its wall-to-wall inspections.

**B.  Breach**

Under the Good Samaritan doctrine, the defendant's duty is created by the "relation between the parties which the service makes."  Corson, 110 N.H. at 212, 265 A.2d at 318 (internal quotation marks omitted).  The scope of the duty, then, is measured by the extent of the service undertaken by the defendant.  See Blessing v. United States, 447 F. Supp. 1160, 1189 (E.D. Pa. 1978).  Here, the government undertook to perform wall-to-wall inspections of the Somersworth Shoe plant, inspecting every operational machine in the facility.  Therefore, Chase and Ritchie had a duty to exercise due care in carrying out the wall-to-wall inspections.  "The test of due care is what reasonable prudence would require under similar circumstances."  Weldy v. Town of Kingston, 128 N.H. 325, 330-31, 514 A.2d 1257, 1260 (1986).

Under the circumstances presented here, a reasonably prudent inspector would have inspected the bench assembly at issue during the 1975 and 1978 OSHA inspections.  Both compliance officers were charged with the mandatory duty to inspect every operational

machine in the Somersworth Shoe plant.  Both officers were taken through the entire plant, including the stock fitting room, by Somersworth Shoe personnel.  The marker/die-out bench assembly was located on a main traffic aisle in the stock fitting room and was not blocked or otherwise obscured from view during either inspection.  Further, the bench assembly was the type of machine on which both compliance officers had found drive-train violations elsewhere in the plant.  The record reveals no basis upon which the court could conclude that a reasonable OSHA inspector charged with the duty to look at every machine could reasonably fail to look at this machine.  In light of these facts, Chase's and Ritchie's failure to inspect the bench assembly can only be explained by their failure to exercise due care in carrying out their mandatory duties to conduct wall-to-wall inspections of the Somersworth Shoe facility.  The government, therefore, breached the duty of care it owed Irving.[28]

---

[28] Although neither party raised the issue, an argument could be made that OSHA's mandatory policy of inspecting every operational machine itself created the standard of care applicable to Irving's Good Samaritan claim, the violation of which would constitute negligence per se.  See Johnson v. Sawyer, 4 F.3d 369, 376-77 (5th Cir. 1993).  Because the court finds that Chase and Ritchie breached the ordinary standard of care applicable to normal negligence actions, it need not consider whether the compliance officers' actions also constituted

**C.    Harm**

Irving has proven beyond any doubt that she suffered grievous harm when she became entangled with the unguarded rotating shaft.  The government only contests the economic impact of Irving's injuries, not their existence.  Irving's injuries are detailed here and the economic effects of those injuries are discussed below in the context of damages.

Prior to the accident, Irving was a healthy 21-year-old woman.  The exposed drive shaft avulsed her scalp, fractured and dislocated her second cervical vertebra, and left her with permanent neurological damage.[29]  Immediately after she became entangled in the drive shaft, Irving suffered cardiac and respiratory arrest.  When she arrived at Maine Medical Center by ambulance, she was experiencing quadriplegia as a result of her

---

negligence per se.

Because Irving has proven that the government owed and breached a duty under New Hampshire's Good Samaritan doctrine, the government's renewed argument that the misrepresentation exception to the FTCA, 28 U.S.C. § 2680(h), bars Irving's suit fails.  See United States v. Block, 460 U.S. 289 (1983); Irving v. United States, No. C81-501-M (D.N.H. March 13, 1996) (McAuliffe, J.).

[29] Unless otherwise attributed, the findings of fact relating to Irving's injuries are based on Exhibit 23, the videotaped testimony of Eithne C. McCann, M.D.  Dr. McCann practices rehabilitative medicine and oversaw Irving's medical treatment following the accident.

fractured and dislocated vertebra.  Following surgery to repair her scalp avulsion, Irving was moved to the intensive care unit ("ICU"), where she was placed in traction to allow her spine to heal without further damaging her spinal cord.  (Irving, 2/11/85, p. 17-19.)  For a time, Irving was paralyzed from the neck down and could not speak.  She had to be fed, bathed, dressed, and groomed by others.

Approximately one month after the accident, Irving was moved from the ICU to in-patient rehabilitative medicine.  Once in rehabilitation, Irving was taken out of traction and placed in a "halo," a metal support screwed into her skull for the purpose of immobilizing her head and torso.  For over two months, Irving remained in the hospital, slowly relearning how to perform simple tasks such as eating, dressing, walking, and writing.  Through remarkable perseverance and courage she steadily regained significant control over many of her motor functions.

When Irving was discharged from the hospital on January 17, 1980, she could move about without the help of others, but required the aid of a wheelchair or crutches.  (Ex. 22, Tri-Area Visiting Nurses Report.)  She could feed herself, but needed help with bathing and personal grooming.  (Ex. 22, Occupational

66

Therapy Report of Nancy Eastman.)  She also needed assistance with most cooking and homemaking tasks.  (Id.)

Although Irving's condition improved steadily through years of physical therapy, she was left with permanent and severe neurological damage.  Specifically, Dr. McCann diagnosed her as having incomplete Brown Sequard Syndrome and other physical disabilities directly resulting from the injuries she suffered in the accident.  None of the disabilities Irving exhibited at the time of trial is likely to abate during her lifetime.

Incomplete Brown Sequard syndrome has left Irving with impaired reflexes and sensation throughout her body, but especially in her toes and hands.  Her senses of balance and space are also impaired, causing her to fall occasionally.  She is easily fatigued.

Irving also suffers from spasticity that causes her gait to be slow and stiff and also prevents her from moving any part of her body quickly.  The spasticity also adversely affects her fine motor functions and causes her hands and arms to spasm from time to time.  Dr. McCann estimated that Irving must perform all motor functions at 50% the normal rate of speed.  Given these symptoms, Irving has also suffered depression.  (Ex. 22, Tri-Area Visiting

Nurses Report; Wayne Irving, 2/11/85, p. 115; Irving, 2/11/85, p. 28.)

Dr. McCann estimated that the cumulative effect of these symptoms renders Irving 30% permanently physically disabled. Irving cannot run or jump, has trouble negotiating tight corners and hills on foot, and will never be able to perform any physical task quickly. On the positive side, she can bathe, dress, and groom herself, and perform most activities of daily living, albeit at a slow pace.

### D. Proximate Cause

As the final element of her claim, Irving must show that the government's negligence was a proximate cause of her injuries. Chase's and Ritchie's breach of duty proximately caused Irving's injuries if their breach was "a substantial factor in bringing about the harm." Weldy, 128 N.H. at 332, 514 A.2d at 1261 (quoting Maxfield v. Maxfield, 102 N.H. 101, 105, 151 A.2d 226, 230 (1959)). "When determining whether a negligent act was a substantial factor in bringing about an injury, a court must determine both whether the negligence in fact caused the injury and whether the injury was reasonably foreseeable." Clement v. United States, 980 F.2d 48, 53 (1st Cir. 1992) (interpreting

68

Maine tort law); see also Weldy, 128 N.H. at 332, 514 A.2d at 1261 (incorporating both cause-in-fact and foreseeable result inquiries into the substantial factor test); Maxfield, 102 N.H. at 105, 151 A.2d at 230 (same).

## 1. Cause-in-Fact

"Causation-in-fact is, by definition, a factual inquiry which requires a court to determine if an injury would not have occurred but for a defendant's negligence." Clement, 980 F.2d at 54. As the New Hampshire Supreme Court has put it, "It is like a connecting bridge between the negligence and the harm that gives rise to the cause of action." White v. Schnoebelen, 91 N.H. 273, 275, 18 A.2d 185 (1941). Considering a case in which the alleged causal connection was somewhat attenuated, the court expanded upon the same metaphor:

> Usually the bridge is so short as to be crossed in a matter of . . . moments. . . . A long lapse of time may make difficult or even impossible proof that the bridge of causation is unbroken, but if it appear on the balance of probabilities to be intact, it will bear the necessary weight of conveying negligence to harm, so that the two may merge into a cause of action.

Id. (discussing cause-in-fact in the context of statute of limitations) (emphasis added). Here, too, the causal bridge is

69

long and (remaining faithful to the metaphor) is composed of many separate sections. But Irving has overcome the difficulties inherent in proving the requisite causal connection and has demonstrated by a preponderance of the evidence that but for the negligence of Chase and Ritchie, she would not have suffered the injuries that she did.

Irving has proved by a preponderance of the evidence each critical event in the causal connection between Chase's and Ritchie's negligence and her injury. If Chase or Ritchie had inspected the bench assembly as they were required to do, they would certainly have noticed the unguarded rotating shaft. It would have been blatantly obvious to any trained OSHA inspector. (Chase, 2/12/85, p. 110, 112, 119, 128, 134; Amirault, 2/12/85, p. 66.)

Had either compliance officer observed the exposed shaft during his inspection, he would certainly have documented it as a violation of the OSHA safety standards that require drive mechanisms to be guarded. This finding is supported by several pieces of evidence. First, both Chase and Ritchie documented several similar workplace conditions as OSHA safety violations during the 1975 and 1978 inspections. (Ex. 8, OSHA Compliance Worksheet at 3; Ex. 9, OSHA Worksheet at 7-9.) Second, Chase

himself all but admitted that, had he seen the unguarded rotating drive shaft on the bench assembly, he would have recognized and documented it as a violation. (Chase, 2/12/85, p. 110, 112, 119, 128, 134.) Third, Area Director Amirault stated that an ordinary safety inspector observing the unguarded shaft would have determined it to be a safety violation. (Amirault, 2/12/85, p. 67.) Finally, O'Connell readily determined that the unguarded shaft was a blatant violation of OSHA safety standards when he observed it during his post-accident inspection. (O'Connell, 2/12/85, p. 158-59.)

If either Chase or Ritchie had documented the shaft as a violation, Somersworth Shoe would have been informed of the violation in two separate ways. First, both compliance officers held closing conferences with Somersworth Shoe representatives in which they discussed all potential violations identified during their respective inspections. (Ex. 8, OSHA Narrative at ¶ 12; Ex. 9, OSHA Narrative at ¶ 8, 20.) Second, Area Director Amirault would have cited the bench assembly as a serious (or at least a non-serious) violation of 29 C.F.R. § 1910.219(c)(2)(ii) and issued that citation to Somersworth Shoe. The most direct evidence of this is that OSHA did, in fact, cite the shaft as a serious violation of OSHA safety standards following the post-

71

accident inspection. (Ex. 10, Citation and Notification of Penalty at 1.) In addition, given the fact that the 1975 and 1978 inspections both led to the issuance of non-serious citations for similarly unguarded drive mechanisms (Ex. 8, Citation at 2; Ex. 9, Citation and Notification of Penalty at 1-2), it is more likely than not that Somersworth Shoe would have been issued a citation for the unguarded rotating drive shaft on the bench assembly in 1975 and in 1978 had the inspectors looked at the machine.

Had Somersworth Shoe been notified that the drive shaft was in violation of OSHA safety standards, the company would almost certainly have abated the violation in a timely manner. In their respective closing conferences in 1975 and 1978, the compliance officers discussed abatement with Somersworth Shoe representatives. (Ex. 8, OSHA Narrative at ¶ 12.) In addition, formal citation would have triggered a mandatory abatement process. (Amirault, 2/12/85, p. 34.) Somersworth Shoe's policy was to abate all cited violations within the period set by OSHA.[30] (Couture, 2/12/85, Supp. at 6, 11.) And all pertinent

_____

[30] On the other hand, but equally compelling, the evidence also indicates that, absent a finding by an OSHA compliance officer that a machine was in violation of safety standards, Somersworth Shoe was reluctant to abate apparent hazards. For instance, before Irving's accident, Rothwell told the company

evidence introduced at trial shows that the company did, in fact, timely abate all violations cited during the 1975 and 1978 inspections.[31]  (Chase, 2/12/85, p. 140; Ritchie, 2/12/85, p. 152; O'Connell, 2/12/85, p. 162; 2/13/85, p. 9; Amirault, 2/12/85, p. 84.)  The consistency and promptness with which Somersworth Shoe abated all other OSHA violations for which it was cited leads the court to conclude that the company would have guarded the drive shaft on the bench assembly if the shaft had been found by OSHA to be in violation of safety standards.

Finally, had Somersworth Shoe installed a stationary casing or trough on all four sides of the drive shaft as required by 29 C.F.R. § 1910.219(c)(2)(ii), Irving would likely not have been entangled in the shaft and seriously injured.  (See O'Connell, 2/12/85, p. 160 (stating that the regulation required the drive

---

that the drive shaft on the die-out machine was unguarded.  Yet, Somersworth Shoe declined to remedy the situation until OSHA cited the shaft.  (Rothwell, 2/12/85, p. 14-17.)  This underscores the extent to which (being perhaps overly charitable) Somersworth Shoe relied on the specialized knowledge of OSHA compliance officers, but in any event it shows how directly employee safety was related to OSHA inspections.

[31] Shortly after Irving's accident, Gino Ruscitti, the plant manager, displayed to O'Connell a very uncooperative attitude regarding abatement of the unguarded drive shaft.  (O'Connell, 2/13/85, p. 10, 32.)  But, in spite of its initial defensive attitude, Somersworth Shoe did proceed to guard the shaft within the abatement period set by OSHA.

shaft to be guarded on all four sides).)  Professor Igor Paul
gave unrebutted testimony that Irving's accident could not have
occurred if the shaft had been guarded as required, and the court
so finds.  (Paul, 2/14/85, p. 23-24.)  The relevant physics
confirms Dr. Paul's opinion.  Had a guard been in place, the
vacuum effect created by the high velocity would likely not have
drawn Irving's hair toward the spinning shaft.  And, even if her
hair had come near the shaft, the guard would have prevented it
from becoming entangled.

The causal connection in this case is indeed long, both
temporally and in the number of steps it incorporates, but at
each critical step Irving has carried her burden of proof.  The
court finds therefore, that but for the negligence of Chase
and/or Ritchie,[32] Irving would not have suffered the injuries of
which she complains.


### 2.  Foreseeable Result

---

[32] Because both Chase and Ritchie were employees of the
defendant, the court need not determine which of the compliance
officers was primarily responsible for Irving's injuries.  Nor
need the court determine whether Ritchie's negligence in the 1978
inspection breaks the bridge of causation from the 1975
inspection to the injury.

74

As a final prerequisite to proving proximate cause, Irving must demonstrate that her injury was the reasonably foreseeable result of the government's negligence. "An injury is reasonably foreseeable when a defendant's negligent conduct `creates a risk that might reasonably be expected to result in such injury or damage, even though the exact nature of the injury or damage need not, itself, be foreseeable.'" Clement, 980 F.2d at 54 (quoting Fowler v. Boise Cascade Corp., 948 F.2d 49, 53 (1st Cir. 1991)); see also LeFavor v. Ford, 135 N.H. 311, 315, 604 A.2d 570, 573 (1992); Weldy, 128 N.H. at 332, 514 A.2d at 1261; Maxfield, 102 N.H. at 105, 151 A.2d at 230.

Here, the risk of employee injury was clearly a foreseeable result of the compliance officers' negligence. The declared purpose of the Act is to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651. Congress sought to effect this purpose by, among other things, "providing for the development and promulgation of occupational safety and health standards," 29 U.S.C. § 651(b)(9), and "by providing an effective enforcement program which shall include a prohibition against giving advance notice of any inspection." 29 U.S.C. § 651(b)(10). The ultimate

75

purpose of Chase's and Ritchie's inspections was, therefore, to prevent workplace injuries like those Irving suffered.

The fact that both Somersworth Shoe and its employees also had a duty to comply with OSHA safety standards does not render Irving's injuries unforeseeable to a reasonable compliance officer. This is particularly true in light of the fact that Somersworth Shoe had no full-time safety staff or safety training program, a fact of which Ritchie, at least, was aware. (Ritchie, 2/12/85, p. 151.) And both compliance officers knew that the Somersworth Shoe plant contained numerous safety violations despite the employer's independent duty to eliminate them. It was reasonably foreseeable that Somersworth Shoe would not guard the drive shaft absent OSHA intervention.[33] While Somersworth Shoe's failure to guard the drive shaft may indicate that it, too, could be liable for Irving's injuries, it does not render the government, the sole defendant in this action, less liable in tort for the foreseeable results of its own negligent acts.

---

[33] Although the government does not explicitly argue that Somersworth Shoe's failure to guard the shaft on its own initiative was a superseding, intervening cause, the court here rejects such an argument by holding that both the company's failure to guard the shaft absent citation and Irving's injuries were reasonably foreseeable.

## E. Comparative Fault

Unable to effectively place sole responsibility for Irving's injuries on Somersworth Shoe, the government argues that its liability to Irving is eliminated or substantially discounted by her own comparative fault. New Hampshire's current comparative fault statute, N.H. Rev. Stat. Ann. ("RSA") § 507:7-d (Supp. 1994), does not apply to this case because the cause of action arose before July 1, 1986, the effective date of the statute. Rather, Irving's case is governed by RSA 507:7-a, New Hampshire's original comparative fault statute, repealed in 1986 but applicable to claims arising between 1970 and 1986. See Hewes v. Roby, 135 N.H. 476, 478, 606 A.2d 810, 811 (1992).

Section 507:7-a stated:

> Contributory negligence shall not bar recovery in an action by any plaintiff, or his legal representative, to recover damages for negligence resulting in death, personal injury, or property damage, if such negligence was not greater than the causal negligence of the defendant, but the damages awarded shall be diminished, by general verdict, in proportion to the amount of negligence attributed to the plaintiff . . . . The burden of proof as to the existence or amount of causal negligence alleged to be attributable to a party shall rest upon the party making such allegation.

N.H. Rev. Stat. Ann. § 507:7-a (repealed 1986) (emphasis added). The government contends that it has met its burden of proving by

77

a preponderance of the evidence that in reaching down to retrieve her glove Irving failed to conduct herself as an ordinary prudent person would under similar circumstances.

At the heart of the government's comparative negligence claim is the argument that Irving crawled underneath the bench assembly in order to retrieve her glove even though she knew or should have known of the obvious danger posed by the drive mechanism located there. The court has already, implicitly at least, rejected the notion that Irving actually crawled underneath the bench to pick up her glove. To the contrary, when Irving bent over in the narrow aisle between the bench assembly and the die rack, the vacuum created by the rotating shaft drew her hair into contact with it. In light of the testimony by Irving and Dr. Paul regarding the chain of events immediately preceding the accident (Irving, 2/11/85, p. 12; Paul, 2/14/85, p. 29), the mere fact that the shaft was located approximately 16 inches in from the rear edge of the bench is not sufficient to support a finding that Irving actually crawled underneath the bench.

Similarly, Irving cannot be charged with either actual or constructive knowledge of the dangerous condition that the unguarded shaft created. The government acknowledges, as it

78

must, that Irving was not actually aware of the existence of the shaft. (See Irving, 2/11/85, p. 39.) While she was aware that the die-out machine located next to the manually powered marker machine on which she worked was powered by an electric motor, Irving cannot fairly be charged with knowledge that the drive mechanism for the die-out machine consisted of a long shaft running along the length of the back of the bench assembly and rotating with sufficient velocity to create a vacuum capable of drawing hair or clothing to it. She was a factory worker, not a mechanical engineer or a trained safety professional. She cannot fairly be charged with the knowledge that the unguarded shaft posed a significant danger to her if she bent down in an aisle in which workers were expected to be to pick up a glove.

Irving's stooping to retrieve her glove does not constitute failure to exercise due care under these circumstances.[34]

---

[34] The government does not argue that Irving was comparatively negligent because she wore her hair long and failed to wear some type of hat. However, this argument, too, would likely fail. At the time of the accident, Irving was working on a manually powered machine; Somersworth Shoe policy did not, therefore, impose clothing or hair restrictions upon her. (Gosselin, 2/11/85, p. 94; Rothwell, 2/12/85, p. 12.) Nor did the government present any evidence that, had Irving worn her hair in a different manner, the accident would not have occurred. The government, therefore, has not met its burden of proving causal comparative negligence on Irving's part, as required by RSA 507:7-a.

Accordingly, the government is legally responsible for the injuries Irving suffered and is liable for the full amount of damages she incurred as a result of those injuries.

### F.    Damages[35]

"The usual rule of compensatory damages in tort cases requires that the person wronged receive a sum of money that will restore [her] as nearly as possible to the position [s]he would have been in if the wrong had not been committed." Smith v. Cote, 128 N.H. 231, 243, 513 A.2d 341, 348 (1986).  In awarding damages, the court may consider:  (1) the reasonable value of medical care incurred and likely to be incurred in the future; (2) lost wages — past, present, and future — including the lost value of services provided in the home; and (3) reasonable compensation for pain, discomfort, and distress suffered, including the loss of capacity to enjoy life.  See New Hampshire Civil Jury Instructions § 9.2 (1989) (citing Restatement (Second) of Torts § 924 (1965)).

---

[35] In assessing damages, the court has before it only the evidence presented at the original trial on February 14, 1985. It is that date, therefore, that separates past from future damages.

At trial Irving presented unrebutted evidence that her past medical and other treatment-related expenses totalled $84,469.88. (Ex. 13, Summary of Medical Expenses; Ex. 12, Medical Bills.) Those expenses were necessarily incurred in the course of treating her injuries. She also presented an unchallenged estimate of $22,399.80 in future medical expenses likely to be incurred. (Ex. 13, Summary of Medical Expenses.) The court finds Irving's estimate of future expenses to be well within reason. If anything, it is conservative, taking into account only future medications. Therefore, the court finds the reasonable cost of medical care incurred and likely to be incurred to be $106,869.68.

In support of her claim for lost wages, Irving offered the expert testimony of Charles C. McGoldrick, Jr. McGoldrick had considerable experience in vocational rehabilitation, vocational evaluation, and vocational placement of industrially-injured workers. (McGoldrick, 2/13/85, p. 3-7.) He also had graduate-level training in statistics and research design techniques. (Id.) However, McGoldrick was not an economist. The court has taken into account McGoldrick's relative experience in these several fields of study in drawing conclusions from his testimony.

Because Irving has been continuously employed only since February 1984, her claimed lost wages fall into two convenient temporal categories. The first runs from October 1979 until February 1984; the second runs from February 1984 through the end of her expected working life. For nearly the entire period from October 1979 until February 1984, Irving was unable to find work as the direct result of neurological damage she suffered in the accident.[36] (Irving, 2/11/85, p. 49; Ex. 15, Vocational Report at 3-4; Ex. 23, Videotaped Testimony of Dr. McCann; McGoldrick, 2/13/85, p. 17.) Irving remained unemployed throughout this period despite repeated, good-faith attempts to find work through a number of specialized placement agencies and firms, including the New Hampshire Division of Vocational Rehabilitation, Comprehensive Rehabilitation Associates, and the Job Placement Office of MacIntosh College. (Ex. 15, Vocational Report at 15.)

At the time of the accident, Irving was a high-school graduate with some vocational training who was earning just above the minimum wage for her work at Somersworth Shoe. (McGoldrick,

---

[36] The single, short exception occurred in the summer of 1983 when Irving held a job at a telephone answering service for less than two months. However, her inability to write at the fast pace required by the job prevented her from performing satisfactorily, and she was forced to look for work more suited to her physical limitations.

2/13/85, p. 19.)  Assuming that Irving had remained employed at the minimum wage from October 1979 until February 1984, McGoldrick estimated her lost wages during that period to be $27,974.[37]  (Ex. 15, Vocational Report at 4; McGoldrick, 2/13/85, p. 18.)  McGoldrick also provided an alternate estimate based on the assumption that Irving, an experienced shoe-factory worker, would have earned $6.00 per hour, rather than the minimum wage, during the period between October 1979 and February 1984.  Irving's estimated lost wages for that period under that assumed wage total $51,886.

Although there is some evidence in the record to indicate that but for the accident Irving was capable of earning considerably more that the minimum wage between October 1979 and February 1984 (see McGoldrick, 2/13/85, p. 19, 32), there is insufficient evidence to support the conclusion that she would have regularly earned $6.00 per hour throughout that period.  Irving would, more likely than not, have earned more than the minimum wage.  In fact, she was earning slightly above the

---

[37] This estimate is adjusted to take into account the wages Irving actually earned during her two months at the answering service.  In estimating all lost wages, McGoldrick utilized the "total offset" method, that is, he assumed wage growth and inflation would perfectly offset one another.  He did not, therefore, utilize the discount method of calculating present value.

minimum wage at the time of the accident.  But it is also likely that, given the cyclical and unpredictable nature of the shoe manufacturing business and Irving's past work experience, she would have been unemployed for portions of the period between October 1979 and February 1984.  (See McGoldrick, 2/13/85, p. 33.)  Taking all of these factors into account, the court finds Irving's lost wages for the period from October 1979 until February 1984 to be $28,000.

As of the trial on the merits in February 1985, Irving had been employed for one year as a secretary and receptionist by the Internal Revenue Service ("IRS") through a federal program that gives hiring preference to individuals with physical disabilities.  (Ex. 15, Vocational Report; McGoldrick, 2/13/85, p. 21; Irving, 2/11/85, p. 50.)  As a result of her physical disabilities, Irving works at approximately 60% of normal capacity in that job.  (McGoldrick, 2/13/85, p. 15-16.)  Although she will likely continue to be employed at the IRS throughout her working life, Irving's disabilities render it unlikely that she will be promoted beyond her current position.  (McGoldrick, 2/13/85, p. 16.)  Irving's limitations also prevent her from successfully competing in the wider labor market without the aid

of preferential treatment. (McGoldrick, 2/13/85, p. 17.) Irving earns $5.50 per hour at the IRS.

Assuming that but for the accident Irving would have earned an average of $6.00 per hour throughout her working life, McGoldrick estimated Irving's past and future lost wages beginning in February 1984 to be $43,293. Although it was unrealistic to expect Irving to earn as much as $6.00 per hour by 1984, it is quite reasonable, probably conservative, to conclude that Irving would have earned an average of $6.00 per hour during her expected working life. Taking all of the relevant factors into account, including the probability that Irving would likely have experienced periods of unemployment during her working life, McGoldrick's estimate of $43,293 is reasonable and supported by the evidence. On the other hand, his alternate estimate of $203,840 in lost wages after February 1984, based on an average lost wage of $8.00 per hour, is not persuasive and not supported by the evidence. The court finds the total reasonable value of Irving's lost wages — past, present, and future — to be $71,293.

The court must also take into account the value of services Irving cannot perform in the home as the result of the accident. Based on testimony that went essentially unchallenged by the government, McGoldrick estimated that Irving would have performed

85

work in the home valued at $322,187 from October 1979 until the expected end of her life if the accident had not occurred. He then estimated that as a result of the accident Irving is only able to perform 20% of that work. Based on these estimates, he calculated the value of lost work around the home to be $257,750. (McGoldrick, 2/13/85, p. 27; Ex. 15, Vocational Report.)

The court finds McGoldrick's estimate of Irving's capacity to perform work around the home to be overly pessimistic. The medical evidence established that Irving is able to perform most tasks, but at half normal speed, and she is the type of person likely to persevere despite the obstacles in her path. Assessing Irving a more appropriate 50% disability regarding tasks performed around the home, the work lost in the home is reasonably valued at $161,000.

Finally, the court must tackle the always difficult task of assigning a dollar value to Irving's pain, suffering, and diminished capacity to enjoy life. "[C]onverting feelings such as pain, suffering, and mental anguish into dollars is not an exact science," Correa v. Hospital San Francisco, 69 F.3d 1184, 1197 (1st Cir. 1995), cert. denied, 116 S.Ct. 1423 (1996), and it "is particularly difficult to estimate upon a mere examination of the record." Anthony v. G.M.D. Airline Servs., Inc., 17 F.3d

490, 495 (1st Cir. 1994).  Nonetheless, the court must award appropriate, full and fair money damages in an effort to make the plaintiff whole, to the limited extent money can compensate for such losses.

Irving's experience was undeniably traumatic.  Describing the accident, Irving stated, "I remember getting pulled in and a feeling of choking.  And then it was — went all black and my ears like started buzzing and I remember thinking this is what it's like to die.  I thought I was dead."  (Irving, 2/11/85, p. 14.) After the accident, Irving endured painful treatment, including surgery to repair her torn scalp, full-body traction, and a metal halo screwed into her skull.  Even after surgery and rehabilitation, she was left with the daily discomfort of increased muscle spasticity and occasional muscle spasms.  While no amount of money can ever assuage the suffering she has endured and will endure, fair and full compensation as best as it can be approximated must be awarded.  Fair compensation for the pain and suffering Irving endured and will endure as a direct result of the accident is $400,000.

By far the most serious single deprivation Irving has suffered is a diminished capacity to enjoy life.  Prior to the accident, Irving was a healthy, active person who enjoyed

physical activities of all sorts.  (Loubier, 2/11/85, p. 72.)
Today, Irving can engage in few of the physical activities that
once gave her pleasure.  She cannot perform tasks that require
much manual dexterity.  Simple activities like running and
jumping are impossible for her.  Even walking in a normal fashion
takes considerable effort.  She must perform at half-speed those
physical activities in which she can engage, and her condition
decreases the amount of energy she can expend in any single day.
All of these effects of the accident substantially diminish
Irving's capacity to enjoy life and none of them is likely to
abate.  Taking all of these factors into account, fair
compensation for Irving's lost capacity to enjoy life is
$500,000.

In her original administrative claim, filed with the
Department of Labor on November 25, 1980, Irving requested money
damages in the amount of $1,000,000.  The FTCA provides that,
with limited exceptions, "[a]ction under this section shall not
be instituted for any sum in excess of the amount of the claim
presented to the federal agency."  28 U.S.C. § 2675(b).
Consistent with that statute, the ad damnum clause of Irving's
complaint requested money damages of $1,000,000.  Nearly fifteen
years after filing her complaint, Irving moved this court to

88

increase her _ad_ _damnum_ to an amount in excess of the amount she sought in her administrative complaint arguing, _inter_ _alia_, that the extraordinary delay in resolving this litigation, and attendant economic inflation, justified increasing the requested award.  This court previously acknowledged that economic inflation has reduced the real value of the award Irving requested in her original complaint.  Nonetheless, the court was constrained to deny Irving's motion to increase her _ad_ _damnum_, _Irving v. United States_, No. C81-501-M, slip op. (D.N.H. March 13, 1996) (McAuliffe, J.), because such a request is, in fact if not in name, a request for pre-judgment interest in light of the Supreme Court's decision in _Library of Congress v. Shaw_, 478 U.S. 310, 321-22 (1986).  The FTCA, 28 U.S.C. § 2674, specifically preserves the government's sovereign immunity from awards of pre-judgment interest.  So, although Irving has proved damages in excess of $1,000,000, the court's ability to award damages is limited by the _ad_ _damnum_ clause of her complaint.[38]  Accordingly,

---

[38] The court recognizes that Irving has been materially prejudiced by several unusually long delays, all of which were entirely attributable to the court and its workload and none of which were attributable to the litigants.  The prejudice arises from the fact that the court's findings regarding the amount of damages proven are necessarily expressed in 1996 dollars, while the administrative claim cap on the damages award is of course expressed in more valuable 1979 dollars, and cannot be converted to 1996 dollars to take into account inflationary effects.  _See_

89

judgment shall be entered in favor of Irving in the amount of $1,000,000.

---

Library of Congress, 478 U.S. at 322. (It follows that if the court's findings as to damages were expressed in 1979 dollars, the amount of damages proven would of course fall below the one million dollar amount demanded in the administrative claim.)

If it were to have any practical remedial effect, the court, following the maxim "actus curiae neminem gravabit," would exercise its equitable power to enter judgment nunc pro tunc as of February 14, 1987 — a date that would account for a reasonable time under the conditions then prevailing for decision after the case was submitted to the court on February 14, 1985. See Mitchell v. Overman, 103 U.S. 62, 64-65 (1881) (stating that it is the court's "duty" to enter judgment nunc pro tunc when a party is prejudiced by unreasonable delay attributable to "the multiplicity or press of business" before the court). However, the government has waived its sovereign immunity from awards of post-judgment interest "only when the judgment becomes final after review on appeal or petition by the United States Government, and then only from the date of filing of the transcript of the judgment with the Comptroller General through the day before the date of the mandate of affirmance." 31 U.S.C. § 1304(b)(1)(A); see also Andrulonis v. United States, 26 F.3d 1224, 1230-31 (2d Cir. 1994). As a result, giving retroactive effect to the court's judgment alone would not result in recovery of post-judgment interest from the effective date of the judgment and would not, therefore, benefit Irving in any tangible respect. Perhaps plaintiff may yet obtain complete equitable relief from the Executive and/or Legislative Branches of government.

SO ORDERED.


                                          _____
                                          Steven J. McAuliffe
                                          United States District Judge

August 29, 1996

cc:  Phyllis Jackson Pyles, Esq.
      Gretchen Leah Witt, Esq.
      Paul R. Cox, Esq.